Barnes & Tucker Company, Appellant, v. Bird Coal Company.

Barnes & Tucker Company, Appellant, v. Fownes et al.

Argued January 5, 1939. Before KEPHART, C. J.,
SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Frederic L. Clark*, with him *Jno. Randolph Young* and
*Shields, Clark, Brown & McCown*, for appellant.

*Maurice Bower Saul*, of *Saul, Ewing, Remick & Saul*,
with him *Thomas P. Mikell*, for appellee, No. 344.

*Fred B. Creamer*, for appellees, No. 345.

OPINION BY MR. JUSTICE MAXEY, March 22, 1939:

Plaintiff, Barnes & Tucker Company, appealed from
the action of the court below in sustaining certain pre-
liminary objections filed by (1) the defendant, Bird
Coal Company (appellee in No. 344), and (2) William
C. Fownes, Jr., and Girard Trust Co., Executors and
Trustees under the will of John Barnes, Deceased, and
Frederick C. Schaeffer, Administrator of the Estate of
Amy F. B. Schaeffer, Deceased (appellees in No. 345),
to plaintiff's bills in equity, asking for discovery and an
accounting of profits claimed to have been made by the
Bird Coal Company and through it by John Barnes

during the years 1927 to 1930, inclusive, out of a contract of the plaintiff with the Public Service Electric Company. Plaintiff claimed that this contract was unlawfully diverted to the Bird Coal Company by John Barnes, sole trustee of the Estate of Thomas Barnes and a former president of the plaintiff, who also was president and in his individual right the sole stockholder of the Bird Coal Company. Amy F. B. Schaeffer was the widow of John Barnes, who died July 3, 1930; she married Frederick C. Schaeffer on June 30, 1932. After her death on January 4, 1936, her surviving husband was appointed administrator of her estate.

The bills were brought on October 5, 1937, and amended on November 8, 1937. As amended, they set forth that plaintiff was engaged in mining and selling bituminous coal in Cambria County, that John Barnes was the sole executor and trustee of the estate of his father, Thomas Barnes, who was the sole owner of the stock in plaintiff company, that John Barnes was elected its president, that the only other officer of this company was its secretary-treasurer, a salaried employee with no interest in the company, that the directors, beside John Barnes, were the secretary-treasurer and E. L. Clarke, and that after the retirement of the secretary-treasurer in 1923, Clarke was elected secretary and John Barnes, treasurer. The bill alleges that on April 20, 1923, plaintiff company entered into a contract with the Public Service Electric Company of Newark, N. J., for 10,000,000 tons of coal to be delivered at the rate of 1,000,000 tons a year, which was the entire production of plaintiff's mines. It is stated that John Barnes organized in 1914 the defendant, Bird Coal Company, and that both the plaintiff and this coal company had the same officers and directors and occupied the same offices, and that the books and records of both companies were kept by the same persons. A strike occurred at the mine of the plaintiff on April 1, 1927, and to supply the demand for coal under plaintiff's contract, John Barnes

caused the defendant, Bird Coal Company, to ship the required coal, such shipments continuing not only during the time of the strike, which ended in September, 1927, but during all of the remainder of 1927, the years 1928 and 1929, and until April 30, 1930. During this period the Bird Coal Company shipped 1,231,741.10 net tons and the plaintiff company shipped 2,300,473.75 net tons under this contract. It is contended that the Bird Coal Company realized profits on this diverted tonnage of approximately $900,000, none of which were paid to plaintiff. The bills also allege that under a uniform custom in the coal trade the plaintiff should have received a commission of at least 10 or 15 cents a ton for the coal delivered under its contract by the Bird Coal Company during the time of the strike.

John Barnes died on July 3, 1930, and on his death his sister, Miss Rachael Barnes, became president of the Barnes & Tucker Company and trustee of the trust created by Thomas Barnes, and continued as such until her resignation on December 24, 1936.

By John Barnes' will, he created a trust of all his holdings in the Bird Coal Company. His widow, Amy F. B. Schaeffer, ultimately took the equivalent of her dower interest in the estate, which included one-third of the Bird Coal Company stock, the balance of which is now held by the trustees of the trust. In due course, Barnes' estate was settled, and, by decree of the Orphans' Court of Delaware County dated December 29, 1931, was formally distributed.

The bills indicate that while Miss Rachael Barnes was president of plaintiff company and trustee of its stock, she, because of her inexperience in business matters, took little or no part in the actual management of the affairs of the company and of the trust, and knew nothing of her brother's alleged misconduct as officer and trustee in the matters here complained of, until after she resigned in 1936. The bills aver that, for this reason, no action was taken during her nominal control of plaintiff com-

pany and of the trust estate to recover from the estate of John Barnes for his mismanagement of the affairs of the plaintiff which resulted in such losses to it and to the trust under which its stock was held. It is also averred that on the resignation of Miss Barnes, John Barnes Mull became president of the plaintiff company, and that "while examining into the tonnage of coal shipped by the plaintiff company to the Public Service Electric Company under the contract of April 20, 1923, he accidentally discovered the diversion of tonnage to Bird Coal Company, and that this was the first knowledge of such diversion had by any officer of the company since the death of John Barnes. . . ." Plaintiff thereupon brought two bills: one against the Bird Coal Company, and the other against the estate of Barnes, the trustees of the trust of the Bird Coal Company stock created by his will, and the estate of his widow.

The bills ask for recovery of the amounts of coal shipped by the Bird Coal Company to the Public Service Electric Company, that the books of the Bird Coal Company be opened to examination by the plaintiff, and that this coal company be ordered to account to plaintiff for all profits made by it from shipping coal "which could and should have been shipped by the plaintiff company and that such profits be declared to be the property of plaintiff company." It is also requested that defendant coal company pay plaintiff a reasonable commission on the coal shipped by defendant during the time of the strike.

Defendant coal company (appellee in No. 344) filed preliminary objections to the bill brought against it, all of which were overruled excepting one, charging laches on the ground that the bill was not filed until seven years and five months after the cause of action arose. This was sustained and the bill dismissed.

The executors and trustees under the will of John Barnes, deceased, and Frederick C. Schaeffer, administrator of the Estate of Amy F. B. Schaeffer, deceased

(appellees in No. 345), filed preliminary objections to the bill brought against them, charging laches and asserting that the defendants are not alleged to have committed any fraud, or to have had any contractual or fiduciary relationship with the plaintiff, and "had no liability to the plaintiff merely because they acquired stock of the Bird Coal Company," and that the executors filed their final account in the Orphans' Court of Delaware County where it was confirmed and distribution ordered and made. The court below sustained all of these objections and the bill was dismissed.

In its opinion, the court below said: "The laches of the plaintiff company in asserting its rights bars the present proceedings. When Barnes died his official successors in the management and control of the corporation had its records in their possession, a prompt inspection of which would have disclosed the company's failure to perform its contract. Indeed, the very fact that the president of the plaintiff company, who succeeded Miss Barnes in 1936, immediately discovered the misconduct of John Barnes, discloses how readily a like inspection of the books of the company immediately after his death would have disclosed it. While we are not disposed to criticize Miss Barnes for her failure to discover her brother's wrongdoing, in applying the statute of limitations, consideration cannot be given to the reason for the failure of a plaintiff to discover that which manifestly could be ascertained by a simple inquiry into the circumstances. Nothing will toll the running of the statute except active concealment by a defendant of the evidences of his wrongdoing, and the bills before us utterly fail to aver such affirmative concealment by Barnes as would have tolled the running of the statute or excuse the laches of the plaintiff in this case."

The decrees of the court below must be affirmed. The principles controlling the decision in this case and correctly applied by the court below have frequently been reiterated by this court. In this case, as in *Ashhurst's*

*Appeal,* 60 Pa. 290, "no express trust is either charged or proved. If they [defendants] are chargeable as trustees, the trust must be a constructive or implied one and this whether it arose ex maleficio or out of a conveyance or contract." In the case just cited, this court adopted the opinion of Justice STRONG, who hearing the case at Nisi Prius, said: "In all cases where an attempt is made to fasten a constructive trust" upon another, "the attempt must fail unless made in a reasonable time. . . . Lapse of time is no bar to the assertion of a direct trust, but not so when the trust is constructive." Justice STRONG then quoted with approval the following from the opinion of Sir WILLIAM GRANT in *Beckford et al. v. Wade,* 17 Ves. 87: " 'It is certainly true that no time bars a direct trust as between *cestui que trust* and trustee; but if it is meant to be asserted that a court of equity allows a man to make out a constructive trust, at any distance of time after the facts and circumstances happened out of which it arises, I am not aware that there is any ground for a doctrine so fatal to the security of property as that would be; so far from it, that not only in circumstances where the length of time would render it extremely difficult to ascertain the true state of the fact, but where the true state of the fact is easily ascertained, and where it is perfectly clear that relief would originally have been given upon the ground of constructive trust, it is refused to the party who after long acquiescence comes into a court to seek that relief." Justice STRONG said further: "Equity presumes against the existence of a trust unless it be asserted within a reasonable time. The principle is essential to the security of property. It is in harmony with the course of human conduct generally, and it is in most cases accordant with the actual fact. But what is the reasonable time within which a constructive trust must be asserted? The cases do not clearly define it, and perhaps it is incapable of strict definition. It must vary with the circumstances of each case. For myself, I think it may safely be laid

down that when a party claims to hold another a trustee of personal property under a constructive trust, he must assert the claim within six years from the time when the trust is alleged to have originated, in analogy to the Statute of Limitations. He cannot be permitted to make the assertion afterwards. This, I think, should be regarded as the general rule."

In *Smith v. Blachley,* 198 Pa. 173, 47 A. 985, this court, speaking through Mr. Justice MITCHELL, quoted with approval the following from Wood on the Limitation of Actions, sec. 276: "The provision that if a person, liable to an action, shall conceal the fact from the knowledge of the person entitled thereto, the action may be commenced at any time within the period of limitation after the discovery of the cause of action applies to causes of action for fraud as well as to other causes of action; but the concealment contemplated by the statute is something more than mere silence; it must be of an affirmative character and must be alleged and proved so as to bring the case clearly within the meaning of the statute." Justice MITCHELL then added: "The cases which hold that where fraud is concealed or as sometimes added, conceals itself, the statute runs only from discovery, practically repeal the statute pro tanto. Fraud is always concealed. If it was not no fraud would ever succeed. But when it is accomplished and ended, the rights of the parties are fixed. The right of action is complete. If plaintiff bestirs himself to inquire, he has ample time to investigate and bring his action. If both parties rest on their oars the statute runs its regular course. But if the wrongdoer adds to his original fraud, affirmative efforts to divert or mislead or prevent discovery, then he gives to his original act a continuing character by virtue of which he deprives it of the protection of the statute until discovery." That case was cited with approval in the recent case of *Bernath v. LeFever,* 325 Pa. 43, 47, 189 A. 342, where this court, speaking through Mr. Justice STERN, held that the

operation of a Statute of Limitations was not postponed where the evidence was held insufficient to prove "any independent act of fraud or concealment on the part of the defendant." See also *Johnson v. Hobensack*, 318 Pa. 305, 178 A. 40, and *Cloyd v. Reynolds*, 44 Pa. Superior Ct. 81, 84.

In *Riley v. Boynton Coal Co.*, 305 Pa. 364, 157 A. 794, this court held that twelve years' delay in filing a bill for an accounting constituted fatal laches. In that case the court below dismissed the bill, saying, inter alia: "The general principle is that nothing can call forth the court of chancery into activity but conscience, good faith and reasonable diligence: *Kinter v. Com. Tr. Co.*, 274 Pa. 436, 118 A. 392. The doctrine is founded on the equity maxim that 'equity aids the vigilant, not those who slumber upon their rights.' Its object is in general to exact of the complainant fair dealing with his adversary, and the rule was adopted largely because, after great lapse of time, from death of parties, loss of papers, death of witnesses and other causes, there is danger of doing injustice, and there can no longer be safe determination of the controversy. 'Laches is not to be imputed to a party from mere lapse of time alone; it is an implied waiver, arising from knowledge of existing conditions and an acquiescence in them.'" In affirming the decree of the court below, we said: "Our various statutes of limitations and the rulings of chancellors upon pleas of laches are expressive of the feelings of mankind that, where there are wrongs to be redressed, they should be redressed without unreasonable delay, and where there are rights to be enforced, they should be enforced without unreasonable delay. Those who have interests which they wish to have judicially characterized as legal rights should take prompt measures to bring such interests before the proper tribunals. Persons against whom actions may be threatened have claims to judicial consideration as well as those who threaten such actions; both are equally entitled to have the controversy

between them promptly adjudicated while witnesses are still available and memories are undimmed by long intervening years. . . . In the first volume of Story's Equity Jurisprudence, section 529, that learned jurist says: 'In matters of account, although not barred by the statute of limitations, courts of equity should refuse to interfere after a considerable lapse of time from considerations of public policy.' In *Hammond v. Hopkins,* 143 U. S. 224, it was stated by Chief Justice FULLER, speaking for the United States Supreme Court, that: 'The rule [as to the denial of a belated prayer for a decree for an account] is particularly applicable where difficulty of doing entire justice arises through the death of the principal participants in the transactions complained of, or of the witness or witnesses, or by reason of the original transactions having become so obscured by time as to render the ascertainment of the exact facts impossible.' In *Taylor v. Coggins,* 244 Pa. 228, 90 A. 633, an order dismissing plaintiff's bill was affirmed by this court on the lower court's opinion in which appears the following: 'Laches is not excused by simply saying: "I did not know." If by diligence a fact can be ascertained the want of knowledge so caused is no excuse for a stale claim. The test is not what the plaintiff knows, "but what he might have known, by the use of the means of information within his reach, with the vigilance the law requires of him": *Scranton Gas & Water Co. v. Lackawanna Iron & Coal Co.,* 167 Pa. 136, 31 A. 484.' " In the case of *Kinter v. Com. Tr. Co.,* supra, Justice WALLING summed up the law applicable to the case before us, as follows: "Equity will not lend its aid to one who has slept upon his rights until the original transaction is obscured by lapse of years and death of parties. See *Dalzell v. Lewis,* 252 Pa. 283 [97 A. 407]. . . . Plaintiff is not only chargeable with what he knew but also with what he could have discovered by reasonable diligence." He quotes from the opinion of President Judge RICE in *Goggins v. Risley,* 13 Pa. Superior Ct.

316, as follows: " 'It is a general rule that laches or staleness of demand constitutes a defense to the enforcement of the right or demand so neglected. . . . The doctrine is based in part on the injustice that might result from the enforcement of long neglected rights, and the difficulty, if not the impossibility of ascertaining the truth of the matters in controversy and doing justice between the parties, and in part on grounds of public policy, its aim being the discouragement, for the peace and repose of society, of stale and antiquated demands': 21 C. J. 212, 214."

In *Dalzell v. Lewis,* supra, this court, in an opinion by Justice FRAZER, said: "While a court of equity is not bound by the statute of limitations, it will frequently adopt and apply the statute to corresponding rights and remedies as in a court of law: *Hamilton v. Hamilton's Executors,* 18 Pa. 20; *Neely's App.,* 85 Pa. 387; *Borland's App.,* 234 Pa. 280, 287 [83 A. 110]; and will refuse relief to parties who have slept upon their rights or have been negligent in asserting them: *Slemmer's App.,* 58 Pa. 168; *Halsey v. Tate,* 52 Pa. 311. This is especially true where parties to a transaction are dead or cannot be found and documentary evidence has been lost or destroyed: *Tozier v. Brown,* 202 Pa. 359." In *Grange Nat. Bk. v. First Nat. Bk.,* 330 Pa. 1, 3, this court, speaking through Mr. Justice DREW, said: "Laches bar relief in equity whenever in the chancellor's discretion a party has by his delay disentitled himself to the unusual remedies equity affords to those who deserve them [citing cases]. . . . Plaintiff cannot complain because it has been visited with the consequence of its inexcusable delay."

The record discloses that the appellees would be prejudiced by delay in bringing this action. Not only is John Barnes long since dead but also E. L. Clarke, the other officer of defendant company during the period of the alleged fraud, is now deceased. It is true that Clarke's depositions were taken on his death bed but

counsel contends that at the time these depositions were taken he was subjected to a brief and inadequate examination because of his weakened physical condition. It was also contended that certain important witnesses who were in the neighborhood of the mines during 1927, 1928 and 1929, and who could testify as to the actual condition of plaintiff's mines at that time, cannot now be found. It is also stipulated that the Estate of John Barnes was worth $2,127,000. Appellees contend that if the appellant is successful in this case, the claim plus interest at this time would exceed $1,400,000. The estate has also paid inheritance taxes based on the value of the original estate. Appellees argue that "not only has the proper defense of the case been prejudiced by the delay, but it seems inevitable that those interested in the estate must necessarily have changed their position because of their lack of notice of this claim over so long a period."

The court below not only found that the plaintiff was guilty of laches but also sustained certain other objections of the Executors and Trustees of the Estate of John Barnes, deceased, and of the Administrator of the Estate of Amy F. B. Schaeffer, as hereinbefore noted, and also the further objection made in behalf of the Administrator that Amy Schaeffer was a purchaser for value, without notice of plaintiff's alleged claim, of one-third of the principal of the personal estate of John Barnes, deceased, by virtue of the written election of the late Amy Schaeffer, dated and filed July 3, 1931, to take under the will of her husband, John Barnes; and by virtue of the further election of the said Amy Schaeffer, after the audit, adjudication and distribution of the estate, to take absolutely one-third of the principal of the personal estate rather than to receive for life all of the net income arising from the Estate of John Barnes, deceased.

In view of the fact that plaintiff's actions are adjudged to be barred by laches, it is not necessary to discuss these

additional and, in the court below, successfully made objections to plaintiff's bills.

The decrees are affirmed at appellant's cost.