369 A.2d 416
**COMMONWEALTH of Pennsylvania ex rel.
Ilse Braun GONZALEZ**

v.

**Kenneth Michale ANDREAS, Appellant.**

Superior Court of Pennsylvania.

Submitted March 22, 1976.

Decided Nov. 22, 1976.

308

David L. Allebach, Jr., Pottstown, for appellant.

Louis M. Shucker, Reading, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

CERCONE, Judge:

This is an appeal from an order of the court below denying appellant Kenneth Andreas' petition to terminate his obligation to support appellee's minor child. The unique events giving rise to this appeal are as follows. In January of 1968, appellant arrived in Germany as a member of the United States Army. Shortly after his arrival appellant met and engaged in sexual relations with the appellee. Appellee was unmarried at the time, but was the mother of two illegitimate children. On this first encounter appellee expressed her belief that she was currently pregnant. Subsequent events, however, led the parties to conclude that she was not in fact pregnant at the time of their initial meeting. In any event they continued to cohabitate and appellee became pregnant and advised appellant that he was the father. On August 2, 1968, appellee gave birth and informed the hospital that appellant was the baby girl's father.

On February 5, 1969, the parties married and lived together until May of 1969 when appellant was sent to Viet Nam where he remained until the summer of 1970. In the meantime, the child's surname was changed to that of appellant's. In addition, the parties executed various immigration documents to enable appellee and her child to emigrate to the United States. Pursuant to the execution of these papers, appellant admitted paternity of the child and promised that he would support her.

On July 3, 1970, appellee and the child joined appellant in the United States. They lived together as a family until September of 1971 when appellee and appellant separated. On October 22, 1971, the parties entered into an amicable order of support under which appellant agreed to pay $30 a week for the support of appellee and the child. This order was reduced to $22.50 per week on April 10, 1972. When the parties appeared before the lower court in April of 1972, appellant stated that certain statements by appellee led him to believe that he was not the child's natural father. The court entered the support order without prejudice to either party and advised appellant to obtain counsel and raise the paternity issue in the proper manner. On December 31, 1973, the support order was further reduced to $12.50 per week for the support of the child only.

Nothing further transpired until February 26, 1975, when appellant filed a petition requesting that blood tests be taken to establish paternity. The tests, which were conducted on May 28, 1975, indicated that appellant was not the natural father. On July 8, 1975, appellant petitioned for termination of his support obligation. On January 8, 1976, the lower court denied the petition and directed that the previous order requiring appellant to pay $12.50 a week support for the child remain in full force and effect. This appeal followed, raising the issue of whether appellant is equitably estopped from denying paternity.

In *Commonwealth ex rel. Goldman v. Goldman*, 199 Pa.Super. 274, 184 A.2d 351 (1962), the husband denied paternity of two children born during wedlock and petitioned for blood grouping tests. Although we affirmed the lower court's order that blood tests be taken, we observed that: "We think that [the husband's] right to question the paternity is not unlimited. Where the husband has accepted his wife's child and held it out as his

own over a period of time, he is estopped from denying paternity." *Id.* at 283, 184 A.2d at 355.

Only one year later in *Commonwealth ex rel. Weston v. Weston,* 201 Pa.Super. 554, 193 A.2d 782 (1963), we reversed a lower court order directing the parties to submit to blood grouping tests. In *Weston* the husband questioned the paternity of two children born to his wife during wedlock. We held that since the husband lived with his wife from three to four years after the birth of the children, and accepted them as his own prior to petitioning for the blood tests, he was now estopped from denying paternity.

Similarly, in *Commonwealth ex rel. Hall v. Hall,* 215 Pa.Super. 24, 257 A.2d 269 (1969), we held that where a husband waited almost five years after the child's birth to question paternity, and executed a separation agreement which acknowledged the child to be his own, he was estopped from challenging paternity by requesting a blood grouping test.

Although all of the foregoing cases arose in the context of requests for permission to take blood tests, we are of the opinion that the doctrine of equitable estoppel is also applicable in the instant case where the parties have already submitted to the tests. In either case we believe the dispositive issue should be whether the putative father has indicated by his conduct that the child is his own. Nor do we feel a different result should obtain where the child is born out of wedlock, provided the putative father, as in the present case, subsequently marries the mother and accepts and recognizes the child as his natural issue. For it is fundamental that "[e]quitable estoppel applies to prevent a party from assuming a position or asserting a right to another's disadvantage inconsistent with a position previously taken. P.L.E. Estoppel § 21." *Blofsen v. Cutaiar,* 460 Pa. 411, 333 A.2d 841, 843 (1975). In short, equitable estoppel, reduced to its essence, is a doctrine of fundamental fairness designed

to preclude a party from depriving another of a reasonable expectation when the party inducing the expectation albeit gratuitously knew or should have known that the other would rely upon that conduct to his or her detriment.

Instantly, the child was born in August of 1968 and the parties were married in February of 1969. Although interrupted by appellant's tour of service in Viet Nam, the parties lived together for approximately three years following the child's birth. During this period appellant supported the child as his own and never expressed any doubts about the child's parentage. Most significantly, some fifteen months after the child was born appellant executed various immigration documents and affidavits in which he represented that he was the child's natural father and that the infant would not be a public charge in the United States. It was only after the parties separated that he questioned paternity. Absent any overriding equities in favor of the putative father, such as fraud, the law cannot permit a party to renounce even an assumed duty of parentage when by doing so, the innocent child would be victimized. Relying upon the representation of the parental relationship, a child naturally and normally extends his love and affection to the putative parent. The representation of parentage inevitably obscures the identity and whereabouts of the natural father, so that the child will be denied the love, affection and support of the natural father. As time wears on, the fiction of parentage reduces the likelihood that the child will ever have the opportunity of knowing or receiving the love of his natural father. While the law cannot prohibit the putative father from informing the child of their true relationship, it can prohibit him from employing the sanctions of the law to avoid the obligations which their assumed relationship would otherwise impose.

■    Finally, appellant argues that he is not estopped from denying paternity at this late stage because he was acting under a mistake of fact that he was the child's natural father; and that he never had sufficient knowledge as to render him guilty of gross negligence in failing to ascertain the true state of affairs. This argument is deficient for several reasons. First of all, if appellant's argument is accepted the doctrine of equitable estoppel would have no vitality in cases of this nature, because common sense suggests that in very few instances will a married woman reveal to her husband the true state of affairs. Secondly, when one considers that the parties were not married until six months after the child's birth, and appellee was already the mother of two illegitimate children, it becomes obvious that appellant had both sufficient opportunity and motivation for questioning the paternity of the child before he decided to marry appellee and bring her and the child to the United States.

■    One final point deserves mention. The "Uniform Act on Blood Tests to Determine Paternity," supra, does not make provision for a particular prescriptive period in which a putative father who denies paternity must commence suit. Such a prescriptive period is necessary. In this regard it is instructive to note that the Uniform Parentage Act of 1973, which has been adopted in three jurisdictions, recommends that a putative father who elects to bring an action for the purpose of establishing the non-existence of the father-child relationship must bring the action "within a reasonable time after obtaining knowledge of relevant facts, but in no event later than [five] years after the child's birth." Uniform Parentage Act (9 U.L.A.) § 6(a)(2). However, the action here was not commenced until the child was almost seven years old. Certainly under the circumstances of this

case appellant's lack of diligence [1] in instituting this action should preclude him from now denying paternity.

Order affirmed.

HOFFMAN, J., concurs in the result.

SPAETH, J., files a concurring opinion.

SPAETH, Judge, concurring:

I agree that appellant must support the child. However, my reason for this conclusion is entirely different from the majority's.

I

On October 22, 1971, appellant was a party to an Agreement for Order of Support; the order, entered on October 29, 1971, directed appellant to make weekly payments "for and toward the support of his wife and child." Implicit in that order was an adjudication that appellant is the father of the child. In effect, therefore, appellant now seeks to relitigate the issue of paternity.

This court, confronted with a similar situation in *Commonwealth ex rel. Nedzwecky v. Nedzwecky*, 203 Pa.Super. 179, 199 A.2d 490 (1964), held: "In the absence of an appeal from [the original support] order, the fact of appellant's paternity . . . became established as a matter of law. A relevant fact necessarily determined as a prerequisite to the entry of an original support order may not, under the doctrine of res judicata, be chal-

---

1. As previously noted, in April of 1972 the lower court advised appellant that if he seriously doubted paternity he should engage counsel and properly raise the issue. Notwithstanding the court's advice appellant neglected to file this action until February 26, 1975. Appellant's excuse for delaying litigation because of his impoverished state has little validity in light of the present-day methods of obtaining publicly financed legal assistance. Furthermore, the "Uniform Act on Blood Tests to Determine Paternity," Act of July 13, 1961, P.L. 587, § 3, 28 P.S. § 307.3, makes liberal accommodation for the payment of the fees attached to such proceedings.

lenged or put at issue in any subsequent proceeding."
*Id.* at 182, 199 A.2d at 491. The Supreme Court, citing
*Nedzwecky,* recently applied the doctrine of collateral es-
toppel (which would appear to be a more correct term
than our "res judicata") in a similar case. *In re: Adop-
tion of Robert Dale Young,* 469 Pa. 141, 364 A.2d 1307,
1313 (1976). Under these cases, appellant is collateral-
ly estopped from now raising the issue of paternity.

## II

Having thus agreed with the majority's result, I should
perhaps subside. I believe, however, that the doctrine of
equitable estoppel has been incorrectly invoked by the
majority, and that it was incorrectly invoked in *Com-
monwealth ex rel. Hall v. Hall,* 215 Pa.Super. 24, 257 A.
2d 269 (1969), and *Commonwealth ex rel. Weston v.
Weston,* 201 Pa.Super. 554, 193 A.2d 782 (1963), *alloca-
tur refused.* In my opinion, these cases should be over-
ruled. Moreover, whether I am correct in this opinion is
not, it seems to me, an academic question. Some day we
shall have a case involving a father who attempts to
challenge the paternity of a child *before* a support order
has been entered. In such a case the majority would, I
assume, again find the father equitably estopped. Thus
the legal theory we rely on in the present case will set
precedent; and I fear that the majority's reasoning,
when added to the precedents of *Hall* and *Weston,* will
render those cases despite their incorrect use of equitable
estoppel, immovable.

## A

Equitable "estoppel arises when one by his acts, repre-
sentations, or admissions, or by his silence when he
ought to speak out, intentionally or through culpable
negligence induces another to believe certain facts to
exist and such other rightfully relies and acts on such
belief, so that he will be prejudiced if the former is

permitted to deny the existence of such facts. In this situation, the person inducing the belief in the existence of a certain state of facts is estopped to deny that the state of facts does in truth exist, aver a different or contrary state of facts as existing at the same time, or deny or repudiate his acts, conduct, or statements. . . ."

*Northwestern National Bank v. Commonwealth*, 345 Pa. 192, 196–97, 27 A.2d 20, 23 (1942) (citations omitted).

It is evident from this statement that the doctrine of equitable estoppel was devised to reach a wrongdoer—someone who "intentionally or through culpable negligence" has represented that something was true when it was not.

Here, appellant's representation was that he was the father of the child. This was a misrepresentation, but not a wrongdoer's; appellant believed he was the father.

The majority says, however, that appellant should have known before he married appellee that he was not the father of the child. Majority opinion at p. 313. I suggest that the majority's argument is hardly persuasive. As the majority itself notes, "in very few instances will a married woman reveal to her husband the true state of affairs." *Id.* Appellant and appellee apparently lived together from the time they first met; the fact that they did not decide to marry until after approximately thirteen months does not warrant the majority's conclusion that appellant should have suspected that appellee was not faithful to him. Nor should he have suspected her simply because she had had prior illegitimate children; to say he should have is to insist that he think the worst of a woman with whom he was maintaining a close relationship. In my opinion the majority is arguing by hindsight.

Assume, however, that the majority is right, and that appellant should have known he was not the father of the child. Assume, too, that a party may be equitably es-

topped when he did not know but only should have known that the fact he was representing—here, his fatherhood—was not true.[1] Still appellant may not be equitably estopped. The party demanding that he support the child is appellee; she is the one invoking the doctrine of equitable estoppel. However, appellee has no standing to invoke the doctrine.

> An estoppel can be claimed only by one who has acted in ignorance of the true state of facts . . . , and who was without suitable means of informing himself of their existence . . . .. If he had notice of the facts, and was not misled to his disadvantage there can be no estoppel.

> *Tustin v. Philadelphia & Reading Coal & Iron Co.*, 250 Pa. 425, 436, 95 A. 595, 599 (1915) (citations omitted).

Here, appellee knew better than appellant who was, or at least who might be, the father of the child. Appellant did not induce his wife to believe that the child was his; if anything, the opposite was the case. "Estoppels are used in law as a means to prevent fraud, and never to become its instruments." *Norman v. World Wide Distributors, Inc.*, 202 Pa.Super. 53, 59, 195 A.2d 115, 118 (1963).

The majority seems to suggest that it is the child who has been misled to her detriment. Majority opinion at p. 312. This suggestion, however, only emphasizes the inappropriateness of the doctrine of equitable estoppel in this setting. Children are not legally competent to make changes in position with legal consequences. "A person is not sui juris at any age less than 21 full years, regardless of his physique, mentality, education, experience or accomplishments." *In re Pincus' Estate*, 378 Pa. 102, 109–110, 105 A.2d 82, 86 (1954). Thus, this child has

1. *See GAF Corp. v. Amchem Products, Inc.*, 399 F.Supp. 647 (E. D.Pa.1975). The correctness of the assumption is clearer in cases involving laches. *See Barnes & Tucker Co. v. Bird Coal Co.*, 334 Pa. 324, 5 A.2d 146 (1939).

not changed her position in reliance on appellant's alleged misrepresentations. She did not decide to emigrate to the United States in reliance on appellant's averments on immigration documents, or decide to entrust herself to him as a father, rather than to some other man. Her mother made these decisions for her, and again, the mother's knowledge of the true facts precludes the use of the doctrine of equitable estoppel.

## B

I recognize that my position would require that we overrule *Hall* and *Weston*.[2] I further recognize that "[t]he doctrine of stare decisis . . . is among the most important principles of good government. . . . Rules of law, carefully considered and definitely established, should not be lightly discarded." *Commonwealth v. Poundstone*, 200 Pa.Super. 416, 420, 188 A.2d 830, 832 (1963). Nevertheless, our Supreme Court has not hesi-

2. The Supreme Court has recently cited both *Hall* and *Weston* with approval in *In re: Adoption of Robert Dale Young*, 469 Pa. 141, 364 A.2d 1307 (1976). There, a mother sought to terminate her ex-husband's parental rights by asserting that he was not the true father of a child born during their marriage. The Court held that she was estopped from so asserting. In doing so the Court expressed—in *dictum* only—a rule that would support the majority's use of equitable estoppel in the present case:

> Were the situation reversed and appellee [the ex-husband] to answer today in a proceeding against him seeking to enforce support payments for the minor child under the 1971 separation agreement, there is no doubt that the doctrine of equitable estoppel would prevent his belated questioning of paternity.
> *Id.*

With respect, I can only hope that the Court will reconsider this *dictum* when the question is squarely put before it. In *Young* the doctrine of equitable estoppel could be applied without distorting it, for there it was the mother—one with the means of knowledge whether her ex-husband was the child's father—who misrepresented the true facts to him; and he relied on her misrepresentation. When the parties are reversed, as here, equitable estoppel becomes inapplicable, as I have already discussed.

I also wish to note that I am not the first member of our court to question the use of equitable estoppel in cases like this one. Judge HOFFMAN did so ably in his dissenting opinion in *Commonwealth ex rel. Hall v. Hall*, 215 Pa.Super. at 33–35, 257 A.2d at 272–274.

tated to heed the observation of former Chief Justice von Moschzisker:

> [I]f, after thorough examination and deep thought a prior judicial decision seems wrong in principle or manifestly out of accord with modern conditions of life, it should not be followed as a controlling precedent.

> von Moschzisker, *Stare Decisis in Courts of Last Resort,* 37 *Harvard L.Rev.* 409, 414 (1924).

(I know my readers will smile at the implied suggestion that my opinion here is the product of "thorough examination and deep thought." Vanity, vanity, all is vanity!) *And see,* the discussion of stare decisis in *Ayala v. Philadelphia Board of Public Education,* 453 Pa. 584, 603–06, 305 A.2d 877, 886–88 (1973). If, as in *Ayala,* established rules and principles may be overruled because a court is persuaded that they are "out of accord with modern conditions of life," it seems even more appropriate to overrule decisional law that is founded on flawed reasoning, as I suggest *Hall* and *Weston* were. "[T]he courts should not perpetuate error solely for the reason that a previous decision although erroneous, has been rendered on a given question." *Olin Mathieson C. Corp. v. White C. Stores,* 414 Pa. 95, 100, 199 A.2d 266, 268 (1964). To persist in applying the doctrine of equitable estoppel in cases like the present case is to perpetuate our former error; and "the doctrine of stare decisis is not a vehicle for perpetuating error . . ." *Ayala v. Philadelphia Board of Public Education, supra* at 606, 305 A.2d at 888. I should hope that we subscribe to the statement that "[t]his Court, unlike the House of Lords, has from the beginning rejected a doctrine of disability at self-correction." *Helvering v. Hallock,* 309 U.S. 106, 121, 60 S.Ct. 444, 452, 84 L.Ed. 604 (1940) (Mr. Justice Frankfurter).

## C

It might seem that the doctrine of laches would be an appropriate doctrine by which to decide this case. Since that doctrine stresses the factor of undue delay rather than that of misrepresentation to an ignorant and innocent party, use of it would not be precluded by appellee's knowledge. However, it is axiomatic that "lapse of time, standing alone, is not sufficient to establish laches. A necessary, indeed an indispensible, ingredient of laches is prejudice to the party who asserts it." *Pennsylvania Company for Banking and Trusts v. Philadelphia*, 167 Pa.Super. 637, 641, 76 A.2d 443, 444 (1950). Here, appellee cannot claim prejudice. If anything, appellant's delay in questioning the child's paternity worked to appellee's advantage; it extended the period during which she could insist that it was appellant's responsibility to support his child, rather than her own responsibility.

## D

Despite my disagreement with the majority's reasoning, I am sympathetic to its notion that the child is the one who has been harmed. I quite agree that a supposed parent should not indefinitely be permitted to upset a child's settled sense of family. The need for some time limitation is especially clear in view of the common setting for challenges of this kind—separation and divorce proceedings. Such proceedings are themselves a serious disruption of a child's world; after a certain time has passed we should not permit the added disruption of a paternity challenge.

The ability to discern the need for a remedy, however, does not necessarily imply the power to grant it. Courts have granted many remedies by expanding the common law. Examples might be cited, perhaps especially from the law of torts but also from equity and the law of crimes (before it was codified). Such expansion, how-

ever, may be accomplished only if the court is able to support it by the orderly development of its own doctrines. Where, as here, a remedy lies beyond the reach of these doctrines, it must be granted, if at all, by the legislature.

With respect to the present case, the legislature need not go far for help; the Uniform Parentage Act (U.L.A.) § 6(a)(2)(Supp.1976), which the majority cites, provides a useful guide. Under that Act, either as drafted ("within a reasonable time after obtaining knowledge of relevant facts, but in no event later than [five] years after the child's birth") or as adopted in California (omits "but in no event later than [five] years after the child's birth"), appellant would be barred. In the first alternative he brought his action beyond the five year period; in the second he brought it at the very least more than four years after "obtaining knowledge of relevant facts."[3] It seems to me that such legislation would be beneficial. Whether that is so, however, is for the legislature to decide.

---

**3.** I have already said I do not think it clear that appellant learned relevant facts at or around the time of the child's birth. *Ante* at p. 318. However, appellee and her child came to the United States on July 3, 1970, and "[o]nce in the United States, the appellee made certain statements to the appellant and his relatives, which led the appellant to suspect that he was not the natural father of Christine Dawn." Appellant's brief at 2–3. Thus the summer of 1970 may be taken as the time when appellant had knowledge of relevant facts. From that time I count a delay of more than four years, since I agree with the majority that appellant's claim of financial difficulties cannot excuse his failure to bring the action before February 26, 1975.