422 A.2d 1347

**COMMONWEALTH of Pennsylvania ex rel. Janice ATKINS**

v.

**George H. SINGLETON, Appellant.**

Superior Court of Pennsylvania.

Argued March 11, 1980.

Filed Sept. 5, 1980.

Reargument Denied Dec. 31, 1980.

William Lee Akers, Philadelphia, for appellant.

Eric B. Henson, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before SPAETH, BROSKY and VAN der VOORT, JJ.

SPAETH, Judge:

Appellant was convicted of neglecting to support his minor child in violation of section 4323 of the Crimes Code and ordered to pay $22.50 per week for support. He argues that the action was barred by the statute of limitations.[1]

Section 4323 provides:

(a) **Offense defined.**–A person is guilty of a misdemeanor of the third degree if he, being a parent, willfully neglects or refuses to contribute reasonably to the support and maintenance of a child born out of lawful wedlock, whether within or without this Commonwealth.

(b) **Limitation of action.**–All prosecutions under this section must be brought within two years of the birth of the child, except where the reputed father shall have voluntarily contributed to the support of the child, or shall have acknowledged in writing his paternity, in which case a prosecution may be brought at any time within two years of any such contribution or acknowledgment by the reputed father.

Act of Dec. 6, 1972, P.L. 1482, No. 334, § 1, 18 Pa.C.S. § 4323.

The criminal complaint was filed on May 19, 1977, and alleged that appellant's child, Karanja, had been born on May 31, 1972, and that appellant had not paid support since April 1973. Appellant denied paternity, and also moved to quash the complaint on the ground that the action was barred by the statute of limitations. On July 7, 1977, the complaint was amended to allege that appellant's last contribution had been made not in April 1973 but in the summer of 1975.

---

1. Appellant also argues that the lower court erred in considering evidence concerning a statistical probability of his guilt, and in ordering him to pay $22.50 per week for support. Given our decision on the statute of limitations issue, we shall not reach these arguments.

Conduct that "negatives a defense under the statute of limitations" is an element of the offense, 18 Pa.C.S. § 103, and the Commonwealth bears the burden of proving that the prosecution is within the statute. *Commonwealth v. Kuhn*, 200 Pa.Super. 649, 190 A.2d 337 (1963); *Commonwealth v. Bates*, 1 Pa.Super. 223 (1896). Therefore, here the Commonwealth bore the burden of proving that appellant had made some contribution to Karanja's support within two years of the complaint.

The only evidence of such contribution was the following testimony by Karanja's mother:

Q. When was the last time that he did anything for Karanja?

A. The last time was the meeting at Woolworth's when he bought lunch for us when we saw him.

Q. And when was that?

A. That was around the summer of 1975.

Q. Was that–how did that meeting come about?

A. Well, I was at the bank, in the drive–in section, with Karanja in the car, and he walked up to us and said hi, how about some coffee. And so I said okay. And we selected Woolworth's because it was close by.

N.T. at 28.

The Commonwealth is of course entitled to have this evidence examined in the light most favorable to it. *Commonwealth v. Holmes*, 482 Pa. 97, 393 A.2d 397 (1978). However, no matter how favorable the light, the evidence remains quite unimpressive. The mother offered almost no detail. What does "lunch for us" mean? Did appellant buy food for both the mother and Karanja? Did he buy lunch for each of them, or did he only buy lunch for the mother, which she then shared with Karanja? Also, the mother offered almost no explanation. How did it happen that someone who asked, "How about some coffee?" then "bought lunch?" Finally, it is impossible to avoid regarding the mother's testimony with suspicion. It was only after her first complaint was attacked as barred by the statute of

limitations that the mother conceived of the 1975 "lunch" as constituting a contribution to support, which at least suggests that before that time she had not considered it a contribution to support. However, for purposes of disposition, we shall put aside all reservations regarding the quality or weight of the evidence, and shall assume that it was sufficient to support a finding that appellant bought Karanja some food.[2] On this assumption, the question becomes whether such a single contribution may constitute a contribution to support within the meaning of section 4323(b).

Appellant has cited cases from other jurisdictions holding that for a contribution to support to toll the statute of limitations, there must be evidence that the alleged father engaged in a course of conduct or a pattern of payments "furnished under circumstances as warrant a clear inference that the putative father recognizes the child as his own and indicates his willingness to assume his statutory duty of support." *Wong v. Beckford*, 28 A.D.2d 137, 138, 283 N.Y. S.2d 491, 492 (1967). *See Lindsay v. District of Columbia ex rel. Lindsay*, 298 A.2d 211 (D.C.App. 1972); *Smith v. Gabrielli*, 80 Nev. 390, 395 P.2d 325 (1964); *Mendes v. Pennyfeather*, 11 Misc.2d 546, 174 N.Y.S.2d 766 (1958). Relying on these cases, appellant argues that evidence of only a single payment, such as the purchase here of lunch for the mother and child, as opposed to evidence of a pattern of payments, is insufficient.

This argument cannot be accepted. The cases relied upon by appellant involved the interpretation of statutes that differ from section 4323(b). Section 4323(b), as opposed to some statutes in other jurisdictions, provides that "a prosecution may be brought at any time within two years of any such contribution." The reference to "any ... contribution" would make no sense if evidence of a "pattern of contributions" were required. Moreover, cases interpreting

2. We do not discuss the evidence so forcefully and extensively discussed in the dissenting opinion, for the dispositive issue is not whether the evidence was sufficient to prove paternity but whether it was sufficient to prove beyond a reasonable doubt that the statute of limitations was tolled.

section 4323(b) and its statutory predecessor have found evidence of a single contribution sufficient. In *Commonwealth v. Teeter*, 163 Pa.Super. 211, 60 A.2d 416 (1948), this court held the action timely when brought within two years of the defendant's mailing a payment of ten dollars to the mother. In *Commonwealth v. Boyer*, 168 Pa.Super. 16, 76 A.2d 230 (1950), we held the action timely where the evidence was that within two years of the prosecution the defendant had made gifts to the child, and had called at the hospital where the child was confined with illness and had given the mother twenty–five dollars toward the expenses incident to the illness. Most recently, in *Commonwealth v. Young*, 275 Pa.Super. 588, 419 A.2d 57 (1980), we held a single payment of twenty dollars to have been a contribution to support.

However, while we reject appellant's argument concerning the necessity of evidence of a pattern of payments, we are persuaded that he is correct in maintaining that where only a single payment or contribution has been made, the evidence must show that it was made in circumstances from which it may reasonably be inferred that in making it, the father was recognizing the child as his own.

Section 4323(b) provides but two exceptions to the limitation period of two years from the birth of the child. These are either where the alleged father has "voluntarily contributed to the support of the child," or where he has "acknowledged in writing his paternity." Thus, voluntary contribution and acknowledgment of paternity are assimilated to each other. The plain implication is that the legislature regarded the one as essentially the same as the other, and thus provided that proof of either would have the same effect of extending the period of limitations. It follows that if the evidence of the circumstances surrounding a voluntary contribution is insufficient to support a finding that the contribution amounted to an acknowledgment of paternity, it may not be held that the contribution extended the period of limitations. Thus, in *Commonwealth v. Young, supra*, the evidence of the circumstances surrounding the voluntary

contribution of twenty dollars was held to have extended the period of limitations because it was sufficient to support a finding that the contribution amounted to an acknowledgment of paternity; the only reason the mother asked for the money, and the only reason the father paid it, was for the support of the child. *See Commonwealth v. Teeter, supra* (letters of father indicated that payments were for child support). Similarly, in *Commonwealth v. Boyer, supra,* the evidence of the circumstances of the defendant's visit to the hospital and his payment there to the mother was sufficient to support the finding that the defendant was acting in compliance with a parental obligation and therefore was acknowledging paternity.

■ In the present case, it cannot be maintained that the evidence of the circumstances surrounding appellant's purchase of lunch for the mother and Karanja was sufficient to support a finding that in purchasing the lunch, appellant was acknowledging paternity. The mother did not ask him to purchase the lunch. Nothing she said suggested that she thought of the purchase as a contribution to support. So far as anything appellant said is concerned, it appears that he thought of the purchase as a social courtesy incident to an unplanned encounter. No evidence suggests that the mother accepted the lunch for herself and Karanja as anything more than that.

In making these observations, we have not overlooked the evidence that appellant had some years before made some contributions to Karanja's support.[3] That evidence, however, does not bear upon the nature of the occasion when appellant bought the mother and Karanja lunch. It clearly appears that by 1973 appellant had stopped all contributions to support. There is no basis for an inference that his purchase of lunch in 1975 was either regarded by the mother or was intended by him as a renewal of contribution.[4]

3. *See* footnote 2, *supra.*

4. We note the suggestion by the dissent that application of the statute of limitations here may represent "an unconstitutional deprivation of due process rights." Dissenting opinion at p. 1354. We do

The order of the lower court is reversed and appellant is discharged.

BROSKY, J., files a dissenting opinion.

BROSKY, Judge, dissenting:

I respectfully dissent.

This proceeding was initiated on May 19, 1977 with the filing of a petition for support and private criminal complaint by Janice Atkins, appellee, charging the defendant, George H. Singleton, appellant, with neglect to support a bastard under 18 C.P.S.A. Section 4323,[1] for the child, Karanja, born May 31, 1972. Appellant denied paternity and elected to proceed criminally in a non–jury trial that was heard on October 25, 1977 before ZALESKI, J. of the Court of Common Pleas of Philadelphia County. The verdict of the court was entered on December 8, 1977 finding appellant guilty and suspending sentence. Written post–trial motions were filed and argued, and subsequently denied. A support hearing was held on February 8, 1979, and an order was entered on February 9, 1979 awarding $22.50 per week for the support for child. Appellant's motion to vacate and reconsider sentence was denied after argument on March 9, 1979.

The issues raised by the appellant will be discussed seriatim and will not be limited to a small segment of the testimony but to the entire spectrum.

The appellee testified she is a single woman who met the appellant in 1968 at Temple University and began a sexual relationship with him in December of 1969 which continued on a regular basis through November of 1971, even after

not discuss this possibility, for the issue has not been raised by the Commonwealth. *See Wiegand v. Wiegand,* 461 Pa. 482, 337 A.2d 256 (1975).

1. 18 C.P.S.A. Section 4323 repealed, 1978 April 28, P.L. 106, No. 46 Section 3, effective in 60 days Section 3(a) of Act 1978, April 28, P.L. 106, No. 46 provides that prosecutions already commenced under this section on the effective date of such act shall not be 'affected by the repeal of this section.

appellant was living with another woman (N.T. 13–15). The appellee traveled to Africa with the appellant, his common law wife and another man during the summer of 1971; the appellee had sex with appellant on one occasion during the journey (N.T. 18).

Appellee testified she did not have sexual relations with any man other than the appellant during the period of December, 1969 through November, 1971 (N.T. 14).

Appellee, to make certain she was pregnant, saw Dr. George Eminetti in November and learned she was pregnant eight or nine weeks (N.T. 20). She discussed her pregnancy with appellant. At that time, appellee was living with her mother (N.T. 21a) and appellant convinced appellee to move from her mother's home, with whom she was living, and get an apartment (N.T. 21a) as it might be easier for him to see appellee. Even though she was pregnant, she continued to have sexual relations with appellant (N.T. 22a).

"He seemed to like discussing my pregnancy, and he seemed to enjoy the changes that my body went through and he seemed interested in what was going on and knowing that a body was growing and he seemed proud of it (N.T. 22a). He chose the name Karanja. The name Karanja Ketema means God of the Valley, as we had taken a trip to Africa we travelled in the Rift Valley, which is a very beautiful, scenic place, so for that reason he chose the name" (N.T. 23a).

Appellant chose Pennsylvania Hospital, helped with the admission, helped with the hospital bills, gave appellant money (N.T. 24a). After the child was born, appellant helped pay the apartment rent for a few months, as well as the food and other things (N.T. 26). He was playful, he was fatherly, he would "joust him about" and look after him (N.T. 26a). He continued to have sexual relations with appellee (N.T. 26a). He bought gifts for the child, and one item appellee remembered was a gift of some plain wooden blocks. The last time that appellant did anything for Karanja was a meeting at Woolworth's and buying lunch for appellee and child, Karanja, in the summer of 1975, and that

"he behaved as a father would towards Karanja" (N.T. 28a). Appellant had also taken Karanja to the orthopedist sometime during 1972.

Appellee testified on cross–examination that appellant assumed the responsibility as the father, he has never denied being the father until this case came up (N.T. 46a). Appellant helped out financially several months after the child was born (N.T. 48a). Appellant had gotten fired from his job, money was tight, he was having a problem helping out financially (N.T. 48a).

Appellee further testified on cross–examination that she would ask appellant for money when she would see him and he would continue to help in small ways (N.T. 49a); she did not continue to harass him about money (N.T. 51a); she told her mother and friends appellant was the father (N.T. 54a).[2]

2. Page 23:
   "Q. What part, if any, did George Singleton have in the admission and selection of the hospital?
   A. Well, as far as the–he helped as far as the admission and selection of the hospital. He helped–he helped me with the bills; he helped to pay my hospital bills."
   Pages 25 and 26:
   "Q. Did he–after the child was born, in addition to this money for the hospital bills, did he give you anything for the child?
   A. Yes, he did.
   Q. What did he give you?
   A. Well, he helped to pay for my rent for a few months, as well as the food and other things that I needed.
   Q. Did he visit you and the child after you left the hospital?
   A. Yes, he did.
   Q. How often did he visit?
   A. He would visit about once a month, sometimes more frequently, sometimes less frequently.
   Q. And what was his attitude with regard to the child when he visited?
   A. Well, he was very playful with him, he was friendly, he was fatherly. He would joust him about and look after him."
   Page 27:
   "Q. In addition to paying for your apartment rent and the food and things for the child, did he buy any gifts for the child?
   A. Yes, he did."
   Page 28:
   "Q. And how–when was the–has George Singleton continued to give you anything for the child, to the present time?
   A. Not to this present time.
   Q. When was the last time that he did anything for Karanja?

The quoted testimony is but a thumbnail review of the entire record which supports appellee's position that appel-

A. The last time was the meeting at Woolworth's when he bought lunch for us when we saw him.

Q. And when was that?

A. That was around the summer of 1975.

Q. Was that–how did that meeting come about?

A. Well, I was at the bank, in the drive–in section, with Karanja in the car, and he walked up to us and said hi, how about some coffee. And so I said okay. And we selected Woolworth's because it was close by."

Page 45a–Cross–examination:

"Q. Just try to answer my question. Did you ever tell him (George Singleton) that you thought he was the father of the child?

A. Yes, I didn't feel there was a need. I talked with him about it. I discussed it. And he assumed the responsibility as though he was the father and there was never any question. He has never denied it until this case has come up, ever . . ."

Pages 46a–47a:

"A. There was not a need to say to him, George you are the father, because he never questioned it.

Q. And I believe you said he bought a gift for the child on his second birthday?

A. That's right.

Q. Well, then, do I understand that Mr. Singleton was not making regular gifts or contributions to your support or the child's?

A. Well, he helped out for several months.

Q. But that is several months before the child was born or several months after.

A. After he was born."

Page 48a:

"A. I wondered why he didn't help out for a longer time.

.     .     .     .     .

A. I started asking him I guess several months after Karanja was born.

.     .     .     .     .

A. Well, for one thing he had gotten fired from his job and he didn't–he said that money was getting tight, he was having a problem helping out financially.     .

.     .     .     .     .

A. He said things were hard right now for him and that he was having some difficulties."

Page 49:

"Q. When was the next time that you asked him for money?

A. After that, whenever I would see him I would ask him if he could help out in some way, and he would continue to help in small ways–"

Page 52:

"Q. Did you ask him for money for the child after you understood he was working full time?

A. I did."

lant voluntarily contributed to the support of the child. Furthermore, appellant accepted and recognized that he is the father of Karanja and responsible for his support.

18 Pa.C.S. 4323(b) provides, inter alia, "... the reputed father shall have voluntarily contributed to the support of the child, ..." Neither the legislature nor the reported cases define the quantity or quality of the contribution. We, as a court, should not legislate that "a lunch for us," or that $20 (as in the *Young* case) or any amount, or act or deed, is not a sufficient contribution. Lacking a legislative restriction or definition, it is our view that any such contribution, of whatsoever kind or amount, is sufficient to comply with the intent of the statute.

The court (N.T. 91a) stated, for the record, he has observed the child identified as Karanja, he observed the physical characteristics and coloration of the appellant, he observed appellee, Janice Atkins, her physical characteristics and coloration; the court found appellant to be the father by his observations. The Assistant District Attorney pointed out that the child's eyebrows, the nose and the mouth, are particularly striking in their recognition to those features of the putative father (N.T. 92a).

Appellant testified (commencing N.T. 94a) he had known appellee since 1967, had sexual relations with her until April or May, 1970. He discussed her pregnancy with her around the holidays of 1971 (N.T. 97a); he consented to help her financially (N.T. 98a); he gave her between $380 and $400 around the time the child was born (N.T. 98a).

Between birth of child, May, 1972 and 1976 (when he received correspondence from her attorney) he had "fairly reasonable contact with appellee."

Appellant further testified he got married on August 20, 1970, but formal ceremony was not held until September of 1971 (N.T. 117), and he continued a social relationship with appellee until after her child was born, May, 1972 (N.T. 94–96). He continued seeing appellee and the child on occasion through 1976 (N.T. 100–101).

The Opinion of SPAETH, J. is limited to one incident and excludes all other testimony which establishes paternity and support for the child and relies on the statute of limitations in a very limited and ultra strict construction.

18 C.P.S.A. Section 4323(b) limitations of actions:

"All prosecutions under this section must be brought within two years of the birth of the child, except where the reputed father shall have voluntarily contributed to the support of the child, ... in which case a prosecution may be brought at any time within two years of any such contribution or acknowledgment by the reputed father."

The lower court found from the evidence that appellant voluntarily contributed to the support of the child from birth to purchasing lunch in the summer of 1975, thus eliminating the necessity of passing on whether the "statute of limitations" barred the claim of appellee.

18 C.P.S.A. Section 105 governs the principles of construction which reads as follows:

"The provisions of this title shall be construed according to the fair import of their terms but when the language is susceptible of differing construction it shall be interpreted to further the general purposes stated in this title and the special purposes of the particular provision involved."

Given this guideline, the lower court found the appellant did voluntarily buy lunch for the mother and child during the summer of 1975, and that such purchase, coupled with other contributions, constituted support for the child was sufficient to toll the statute of limitations. The appellant did not deny he bought lunch for his son. The lower court further found, upon review of the record and weighing the credibility of the witnesses, that the elements of the crime charged have been established beyond a reasonable doubt. The defendant–appellant did not deny he voluntarily bought lunch for appellee and child. The Commonwealth is, of course, entitled to have the evidence examined in the light most favorable to it: *Commonwealth v. Holmes*, 482 Pa. 97, 393 A.2d 397 (1978).

In the instant case, the court found appellee's testimony established all the elements of the charge of neglect to support a bastard child: (1) appellant's status as parent; (2) the illegitimacy of appellant's child; (3) appellant's assistance in the support of his child from birth; (4) voluntary purchase of lunch for child during the summer of 1975, coupled with other contributions, tolled the statute of limitations: *Commonwealth v. Parrish*, 250 Pa.Super. 176, 378 A.2d 884 (1977). The lower court saw and heard the witnesses and the credibility of the parties was within the exclusive control of the lower court. A judge who sees and hears the witnesses in a case such as this is in better position than we to decide the issue on the merits: *Goldstein v. Goldstein*, 105 Pa.Super. 194, 160 A. 158.

Absent any overriding equities in favor of the putative father, such as fraud, the law cannot permit a party to renounce even an assumed duty of parentage, when, by so doing, the innocent child would be victimized: *Gonzalez v. Andreas,* 245 Pa.Super. 307, 313, 369 A.2d 416, 419.

In a very recent Opinion of this court, *Commonwealth v. George Young, Appellant*, 275 Pa.Super. 588, 419 A.2d 57 (1980), a brief comment of the facts points out the prosecution was initiated more than two years following the birth of Tamika. The court, PRICE, J., said:

"Obviously, the prosecution here was initiated more than two years following the birth of Tamika. At trial, however, Ms. Bennett testified that appellant gave her $20 in November of 1976, a time within two years of the filing of the indictment. Although appellant would argue that Ms. Bennett did not state that he specifically paid the money for the support of Tamika, this measure of specificity is not required. Immediately prior to inquiring about the $20 payment, the prosecuting attorney had extensively questioned Ms. Bennett on appellant's contribution for Tamika's support. [footnote omitted] Viewing her answer in context, it is clear that Ms. Bennett was referring to a payment for the child's upbringing."

George Singleton, appellant, admitted he had continuous sexual relations with appellee; that he did contribute to the support of the child. Appellee testified she did not have sexual relations with any other man; that appellant never denied being the father of the child. He admitted he voluntarily contributed to the support of the child. This case has more elements establishing appellant's voluntarily contributions to the support of the child than that in which appears the *Young* case, supra.

Dr. Lyndall Molthan was called to testify by the Commonwealth concerning the blood grouping studies that she performed on the parties on May 6, 1977. Dr. Molthan testified the appellant "cannot be excluded as the father of the child on the basis of the tests performed." The doctor further testified that based upon the results obtained and population statistics, 9.3% of the black males could have fathered the child, or there is a 90.7% probability that the defendant–appellant is the father of the child. (N.T. 125, 130–131). The finding that appellant cannot be excluded as the father of the child cannot be challenged by appellant.

The Commonwealth met the burden of establishing paternity as charged, beyond a reasonable doubt. *Commonwealth v. Jacobs*, 220 Pa.Super. 31, 279 A.2d 251 (1971). The evidence reveals that the birth of the child in relation to appellee's pattern of intercourse with appellant, and the date of her last menstrual period, is within the period of gestation. *Commonwealth v. Young*, 163 Pa.Super. 279, 60 A.2d 831 (1948).

We question the imposition of statutory time limits on determinations of paternity where such limits are only imposed upon non–marital children. That this is an unconstitutional deprivation of due process rights has been posited most cogently by the Florida Supreme Court in *Florida Department of Health and Rehabilitation Services on Behalf of Gillespie v. West*, 378 So.2d 1220, 6 FLR 2005 (1980). After a comprehensive review of the applicable decision by the United States Supreme Court, the Florida Court stated:

"Generally, statutes of limitations are enacted to bar stale claims which have been dormant for a number of years but which have not been enforced. The state's objective to avoid stale claims, however, is not valid justification for the discrimination it inflicts on illegitimates since their right to support is a continuing right renewing itself until the child becomes eighteen. An action to determine paternity is not a stale claim when employed as a prerequisite to an illegitimate's obtaining of continuing, recurring support. This right has never become dormant, and for the statute of limitations to act to preclude this right on the basis that it is stale is illogical.

"Furthermore, this statute bears at best a tenuous relationship to the interest it seeks to advance of ensuring the availability of adequate proof of paternity. The arbitrary determination that paternity can only be proved in four years creates an impenetrable barrier to an illegitimate child's right to seek support without considering alternatives which deal directly with the problem of proof. Although proof of paternity may become more difficult with the passage of time, this mere possibility cannot be allowed to work an unconstitutional discrimination against illegitimate children."

Here, again, the introduction of the HLA blood test serves to minimize the effect of the passage of time on paternity determinations by shifting the weight of the evidence to one side. (See 42 Pa.C.S. 6136). However, our treatment of the statutory issues makes the constitutional question academic.

Taking the relevant facts into consideration, the formerly effective law on the subject should not be construed as limiting the remedies available to appellee nor as preventing an action to determine/prove paternity.

The question of paternity is more than support for the child, for the courts and the legislatures of the several states have allowed children born out of wedlock to share in the putative father's estates. We cite only a few examples: Workmen's compensation and unemployment benefits, *Levy v. Louisiana*, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436

(1968); sharing in claims for wrongful death, *Glona v. American Guarantee*, 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968); *Weber v. Aetna Casualty & Surety Company*, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972); granting rights to support of illegitimate children, *Gomez v. Perez*, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973); permitting illegitimate to inherit from their fathers, *Trimble v. Gordon*, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1972).

I would sustain the lower court's order and direct appellant to pay the award of $22.50 per week for the support of Karanja, retroactive to October 12, 1979.

Accordingly, I dissent from the Opinion of Judge Spaeth reversing the lower court, and I would reinstate the lower court's Opinion and affirm the decision of the court below.