**R.K.J.,**

v.

**S.P.K., Appellant.**

Superior Court of Pennsylvania.

Argued June 26, 2013.

Filed Sept. 26, 2013.

---

Kyle M. Baxter, Greensburg, for appellant.

William A. Ryan, Greensburg, for appellee.

Dorean N. Petonic, Scottdale, for participating party.

BEFORE: SHOGAN, LAZARUS and MUSMANNO, JJ.

OPINION BY MUSMANNO, J.:

S.P.K. appeals from the Order denying his Motion for paternity testing and joinder of parties, directing that the child support Order for the minor child, A.Q.K., "remain in full force and effect," and releasing escrowed payments of child support for A.Q.K. to the minor child's mother, R.K.J. We affirm.

The pertinent facts of this case are as follows:

The child at issue in this case, A.Q.K., was born on July 26, 2004. At the time of the child's birth, R.K.J. was legally married to [R.J., Sr.]. R.K.J. and [R.J., Sr.] separated in October of 2003. A divorce complaint was filed on June 23, 2004. . . . A marriage settlement agreement was signed on January 13, 2006[,] and was filed with the [trial c]ourt on January 20, 2006. A divorce decree was entered on February 9, 2006.

R.K.J. and S.P.K. had an "on again off again" relationship for two (2) years prior to the child's birth. The parties resumed their relationship around Christmas of 2003. The parties became engaged and moved in together in February of 2004. The parties lived together for approximately six (6) years after the child was born but never married.

S.P.K. was present at the child's birth and signed an Acknowledgement of Paternity. S.P.K. asserts that at the time of the child's birth, he believed that R.K.J. was divorced from her husband. S.P.K. admitted that he was aware that A.Q.K. was not his biological child. S.P.K. admitted that A.Q.K. and R.K.J. resided with him for the six (6) years they were together and that he claimed A.Q.K. on his federal taxes. A.Q.K. refers to S.P.K. as "dad" and [ ] S.P.K. held the child out to be his. S.P.K. financially supported A.Q.K. since his birth . . . .

R.K.J. also admitted that she held the child out to be the biological child of [ ] S.P.K. . . . . The parties broke up and R.K.J. filed [a Complaint] for child support. After a child support order was entered [on April 29, 2010], S.P.K. filed a Motion requesting an evidentiary hearing and paternity testing.[1] In September of 2010, th[e trial c]ourt determined that S.P.K. was the father of

---

1. On June 7, 2010, the trial court scheduled an evidentiary hearing and ordered that the support payments "be escrowed until further Order of Court." Order, 6/7/10.

A.Q.K. under the doctrine of paternity by estoppel.[2]

Trial Court Opinion, 1/17/13, at 2–3 (footnotes added, citations omitted).

Subsequently, S.P.K. requested a hearing *de novo*. Praecipe for Hearing *De Novo*, 10/1/10. The hearing officer took judicial notice of the September 2010 Order, denying S.P.K.'s request for paternity testing, and noted that the parties had agreed to stipulate to their net incomes and the amount of a support guidelines order. Findings of Fact, 11/16/10, at 3. Thus, by agreement of the parties, the hearing officer recommended that S.P.K. pay $697 per month for current child support and $25 per month toward arrears. *Id.*

On December 3, 2010, S.P.K. filed Exceptions to the hearing officer's report and "Continuing Objection to Paternity." After a hearing, the trial court denied S.P.K.'s Exceptions on January 27, 2011. S.P.K. then filed a timely appeal to this Court.

On August 23, 2011, this Court affirmed the trial court's decision. *R.K.J. v. S.P.K.*, 32 A.3d 841 (Pa.Super.2011) (unpublished memorandum). Subsequently, the Pennsylvania Supreme Court granted S.P.K.'s Petition for allowance of appeal, vacated this Court's Order, and remanded this case to the trial court for further proceedings in accordance with the Supreme Court's decision in *K.E.M. v. P.C.S.*, 614 Pa. 508, 38 A.3d 798 (2012). *In re R.K.J.*, 615 Pa. 3, 40 A.3d 1184 (2012).

On remand, S.P.K. filed a Motion to Renew Request for DNA Testing, requesting that he, R.J., Sr., and "the individual named by [R.K.J.] as [the] biological father, [T.C.,] be tested." Motion to Renew Request for DNA Testing, 4/6/12. S.P.K.

also filed a Motion for Joinder, requesting that R.J., Sr., Crum, "and/or the individual determined to be the biological father of the minor child be joined to this action." Motion for Joinder, 9/26/12.

The trial court on remand appointed a guardian *ad litem*, and ordered that evaluation of A.Q.K. be conducted by Carol Hughes ("Hughes"), a licensed psychologist. After a hearing on December 13, 2012, the trial court entered an Order denying S.P.K.'s Motions for paternity testing and joinder of parties, and further ordered that "the child support [O]rder entered on April 29, 2010, is to remain in full force and effect and the payments that had been escrowed" be released to R.K.J. Order, 1/17/13. S.P.K. filed the instant timely appeal from the trial court's Order, and a Concise Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

S.P.K. raises the following issues on appeal:

1. Whether the Trial Court erred in applying an economic test of best interest rather than a psychological best interest test in finding that the fiction that S.P.K. is the biological father of the minor child ("Child") should continue when the Pennsylvania Supreme Court's decision, *K.E.M. v. P.C.S.* [614 Pa. 508], 38 A.3d 798 (2012), mandates application of a psychological best interest test?

2. Whether the Trial Court erred in finding that it was in the best interest of the Child to continue the fiction that S.P.K. is the Child's biological father, as the record did not support such a finding?

3. Whether the Trial Court erred in not developing a record on whether it was in the Child's psychological and

---

**2.** The trial court denied S.P.K.'s request for paternity testing and ordered that the es-

crowed support payments be released to R.K.J. Order, 9/10/10.

emotional best interest to continue the fiction that S.P.K. is the Child's father? 4. Whether the Trial Court erred in denying S.P.K.'s motions for genetic testing and to join the Child's biological father as a party to the support action; as per *K.E.M. v. P.C.S.*, "All things being equal … the responsibility for fatherhood should lie with the biological father." 38 A.3d at 810; and further, whether the Court erred by attempting to determine what would be in the Child's best interest without knowing the true biological father and including him in the proceedings?

Brief for Appellant at 4.

S.P.K. first contends that the trial court erred by applying an economic, rather than a psychological test of best interests to determine whether S.P.K. should continue to pay child support for A.Q.K. S.P.K. contends that the Pennsylvania Supreme Court's decision in *K.E.M.* requires application of a psychological best interests test.

■ "Appellate review of support matters is governed by an abuse of discretion standard." *V.E. v. W.M.*, 54 A.3d 368, 369 (Pa.Super.2012). When evaluating a support order, this Court may only reverse the trial court's determination where the order cannot be sustained on any valid ground. *Kimock v. Jones*, 47 A.3d 850, 853–54 (Pa.Super.2012). "An abuse of discretion is '[n]ot merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence of record.'" *V.E.*, 54 A.3d at 369. "The principal goal in child support matters is to serve the best interests of the children through the provision of reasonable expenses." *Mencer v. Ruch*, 928 A.2d 294, 297 (Pa.Super.2007).

■ In *K.E.M.*, the child's mother sought child support from the alleged biological father. *K.E.M.*, 38 A.3d at 799. The trial court, however, held that the mother's husband, H.M.M., should be regarded as the child's father for purposes of child support via the doctrine of paternity by estoppel. *Id.* at 800, 803. On appeal, the Superior Court affirmed the trial court's application of the doctrine of paternity by estoppel. *K.E.M. v. P.C.S.*, No. 1566 MDA 2010 (unpublished memorandum). The Pennsylvania Supreme Court granted allowance of appeal "to consider the application of the doctrine of paternity by estoppel in this case, and, more broadly, its continuing application as a common law principle." *K.E.M.*, 38 A.3d at 803.

In discussing the continued viability of the paternity by estoppel doctrine, the Court in *K.E.M.* acknowledged that a role remains for the doctrine in Pennsylvania common law, "in the absence of definitive legislative involvement." *Id.* at 807. The Court stated that it joined with the following "sentiment" regarding paternity by estoppel, expressed in a prior opinion of the Superior Court:

> Absent any overriding equities in favor of the putative father, such as fraud, the law cannot permit a party to renounce even an assumed duty of parentage when by doing so, the innocent child would be victimized. Relying upon the representation of the parental relationship, a child naturally and normally extends his love and affection to the putative parent. The representation of parentage inevitably obscures the identity and whereabouts of the natural father, so that the child will be denied the love, affection and support of the natural father. As time wears on, the fiction of parentage reduces the likelihood that the child will ever have

the opportunity of knowing or receiving the love of his natural father. While the law cannot prohibit the putative father from informing the child of their true relationship, it can prohibit him from employing the sanctions of the law to avoid the obligations which their assumed relationship would otherwise impose.

*Id.* at 807–08 (quoting *Commonwealth ex rel. Gonzalez v. Andreas,* 245 Pa.Super. 307, 369 A.2d 416, 419 (1976)). The Court in *K.E.M.* stated that "[t]he operative language of this passage centers on the best interests of the child, and we are of the firm belief—in terms of common law decision making—that this remains the proper, overarching litmus, at least in the wider range of cases." *Id.* at 808.

The Court in *K.E.M.* then observed that "some legal parents simply will not fulfill their nurturing and/or financial support obligations" for various reasons. *Id.* at 809. In light of that, the Court stated that a determination of paternity by estoppel "should be better informed according to the actual best interests of the child, rather than by rote pronouncements grounded merely on the longevity ... of parental relationships." *Id.* The Court indicated that the record in *K.E.M.* was "very sparse in terms of [the child's] best interests ... [and] offer[ed] very little feel for the closeness of [the child's] relationship with H.M.M." *Id.* Further, the Court had "no sense for the harm that would befall [the child] if H.M.M.'s parental status were to be disestablished, either fully or ... partially." *Id.*

The Court noted that, although its decision reflected "increased flexibility in the application of the paternity by estoppel doctrine, ... courts have been most firm

in sustaining prior adjudications (or formal acknowledgments) of paternity based on the need for continuity, financial support, and potential psychological security arising out of an established parent-child relationship." *Id.* at 810 n. 12. The Court concluded that paternity by estoppel "continues to pertain in Pennsylvania, but it will apply only where it can be shown, on a developed record, that it is in the best interests of the involved child." *Id.* at 810.[3]

In *K.E.M.*, the Court specifically recognized the following factors as relevant to the child's best interests in this type of support case: (1) a party cannot renounce an assumed duty of parentage when the innocent child would be victimized; (2) the law can prohibit a putative father from employing sanctions of the law to avoid the obligations that his assumed relationship with the child would impose; (3) the closeness of the child's relationship to the putative father; (4) the harm that would befall the child if the putative father's parental status were to be disestablished; and (5) the need for continuity, financial support, and potential psychological security arising out of an established parent-child relationship. As these factors include both psychological and economic considerations, we reject S.P.K.'s contention that *K.E.M.* requires the application of a solely psychological best interests test in applying the doctrine of paternity by estoppel.

■ S.P.K. next contends that the trial court erred in finding that it was in A.Q.K.'s best interests "to continue the fiction that S.P.K. is the Child's biological father...." Brief for Appellant at 15. S.P.K. has not cited any authority in support of this contention. *See Korn v. Epstein,* 727 A.2d 1130, 1135 (Pa.Super.1999)

---

**3.** The *K.E.M.* Court remanded the case to the trial court for further proceedings. *Id.* at 811.

(holding that arguments lacking citation to pertinent legal authority are deemed waived). Moreover, even if not waived, the premise of S.P.K.'s argument is erroneous. The trial court did not find that he is the Child's biological father, but rather found that S.P.K. is A.Q.K.'s father for purposes of this child support action, pursuant to the doctrine of paternity by estoppel.

Estoppel in paternity actions is merely the legal determination that because of a person's conduct (*e.g.*, holding out the child as his own, or supporting the child) that person, regardless of his true biological status, will not be permitted to deny parentage, nor will the child's mother who has participated in this conduct be permitted to sue a third party for support, claiming that the third party is the true father.... [T]he doctrine of estoppel in paternity actions is aimed at "achieving fairness as between the parents by holding them, both mother and father, to their prior conduct regarding the paternity of the child."

*Brinkley v. King*, 549 Pa. 241, 701 A.2d 176, 180 n. 5 (1997) (emphasis and citation omitted).

Here, the following evidence was presented to the trial court on remand. R.K.J. testified that she is not currently employed; the family resides in subsidized housing and receives food stamps; and she relies heavily on her aunt to help with her expenses. N.T., 12/13/12, at 9–10, 11–12. R.K.J. described the ways in which their lives would improve if she were to receive child support for A.Q.K. *Id.*, at 14–15, 58. R.K.J. described how, during the time they lived with S.P.K., S.P.K. often played and wrestled with A.Q.K. *Id.*, at 21. S.P.K. also allowed A.Q.K. to watch him count money and explained the denominations to him. *Id.*, at 21. In addition, S.P.K. inter-

acted with A.Q.K. on family vacations. *Id.*, at 21–22.

R.K.J. indicated that A.Q.K. has frequently asked to see S.P.K., whom he has referred to as "dad" since birth. *Id.*, at 22, 53. R.K.J. stated that S.P.K. provided food, clothing and housing for A.Q.K., and held himself out as A.Q.K.'s father. *Id.*, at 53–54.

S.P.K. testified that he is not and does not wish to be A.Q.K.'s father, and has not had any contact with A.Q.K. for the past two and one-half years. *Id.*, at 61–62. S.P.K. stated that, due to his work schedule, he had very little interaction with A.Q.K. during the time that they lived together. *Id.*, at 62–63. S.P.K. testified that he provided for all of A.Q.K.'s financial needs and had "somewhat" of an emotional bond with him. *Id.*, at 63. S.P.K. stated that he will not have any relationship with A.Q.K. in the future, but he has never told A.Q.K. not to call him "dad." *Id.*, at 65, 71. S.P.K. stated that it was his intention from the time A.Q.K. was born to raise him as his son. *Id.* at 74. Hughes, the court-appointed evaluator, testified that she found it significant that both R.K.J. and S.P.K. had told A.Q.K. that S.P.K. was his father. *Id.*, at 90, 92. A.Q.K. drew a picture of a house and stated that he wanted his mother, his brother, and "my dad who I haven't seen for two school years" to live in the house. *Id.*, at 94. A.Q.K. clarified that he refers to S.P.K. as "dad." *Id.* When Hughes asked A.Q.K. how he felt about not seeing S.P.K., A.Q.K. responded, "I cry lots of times. I miss him." *Id.*, at 94.

Hughes testified that she asked A.Q.K. what it was like for him to be with his father, and A.Q.K. replied that he could not say because he hadn't been with his dad for a really long time. *Id.*, at 98. A.Q.K. told Hughes that, if he had a magic wand, he would use it to get his dad back.

*Id.*, at 99. Hughes testified that S.P.K.'s role in providing for A.Q.K.'s needs was primarily financial. *Id.*, at 104.

Hughes further testified that economic circumstances affect a child's achievement level. *Id.*, at 105. She stated that research has shown that family income below the poverty line affects younger children more significantly than older children. *Id.*, at 107.[4] Hughes indicated that she was aware that R.K.J. has little or no income, and stated that any child is better off if they have sufficient financial resources to meet their needs. *Id.*, at 109.

In addressing A.Q.K.'s best interests, the trial court found that S.P.K. had signed the Acknowledgment of Paternity at A.Q.K.'s birth, knowing that he was not the biological father. Trial Court Opinion, 1/17/13, at 17. Also, S.P.K. had undertaken the responsibility of raising A.Q.K. *Id.* In addition, the trial court observed that the alleged biological father in this case has never seen A.Q.K. and has never been involved in his life. *Id.* Further, A.Q.K. calls S.P.K. "dad" because that is what he was told by both R.K.J. and S.P.K. *Id.* The trial court found that A.Q.K. had bonded with S.P.K. for almost six years, while R.K.J. and S.P.K. lived together, and A.Q.K. still identifies S.P.K. as his father. *Id.* at 18. The trial court further explained that it had reviewed the testimony of the hearings of August 27, 2010, and December 13, 2012, and concluded that it is in A.Q.K.'s best interest to find that S.P.K. is his legal father for support purposes, under the doctrine of paternity by estoppel. *Id.*

■ We conclude that the evidence of record supports the trial court's application of the doctrine of paternity by estoppel. In finding that paternity by estoppel should be applied, the trial court observed

that the purported biological father has never been involved in A.Q.K.'s life. In contrast, S.P.K. held himself out as A.Q.K.'s father for almost six years, lived with A.Q.K. and his mother in his home, told A.Q.K. that he was his father, and provided all financial support for A.Q.K. Further, the evidence before the trial court addressed the factors set forth in *K.E.M.* as relevant to the child's best interests. In addition, the record shows that the trial court did not apply the doctrine of paternity by estoppel by rote, but considered the individual circumstances of this case, as required by *K.E.M. See K.E.M.*, 614 Pa. 508, 38 A.3d at 810 (holding that the doctrine of paternity by estoppel may be applied "where it can be shown, on a developed record, that it is in the best interests of the involved child").

Next, S.P.K. contends that the trial court erred in failing to develop a record on whether it was in A.Q.K.'s psychological and emotional best interests to continue the fiction that S.P.K. is A.Q.K.'s father. As indicated previously, the trial court did develop such a record.

S.P.K. also asserts that the trial court erred by disallowing any inquiry by S.P.K. as to what would be in A.Q.K.'s best interests, including questioning R.K.J. and Hughes on this issue; by not having an independent psychological evaluation that addressed this issue based on the psychological and economic best interests of A.Q.K.; and by limiting testimony concerning the relationship of S.P.K. and A.Q.K. to the time they resided together with R.K.J. We reiterate that the trial court, on remand from the Supreme Court, appointed Hughes to evaluate A.Q.K.'s best interests, and Hughes conducted such evaluation. Thus, there is no merit to S.P.K.'s claim concerning appointment of an evaluator.

---

4. A.Q.K. was eight years old at the time of the December 13, 2012 hearing. *Id.*, at 111–12.

With regard to his claim that the trial court erred in precluding evidence, S.P.K. cites several rulings by the trial court concerning admissibility of evidence. *See* Brief for Appellant at 19.[5]

■ "[T]he admission or exclusion of evidence is within the sound discretion of the trial court." *In re B.L.L.*, 787 A.2d 1007, 1011 (Pa.Super.2001) (citations omitted). "In reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law." *Id.*

> For evidence to be admissible, it must be competent and relevant.... Evidence is relevant if it tends to prove or disprove a material fact.

*Estate of Hicks v. Dana Companies, LLC,* 984 A.2d 943 (Pa.Super.2009); *see also* Pa. R.E. 401, 402.

■ In each cited instance, the trial court sustained objections to the proffered evidence based on lack of relevance. We agree with the trial court's ruling in each instance. In addition, we are not persuaded by S.P.K.'s contention that the introduction of evidence related to the purported biological father was necessary because here, the evidence before the trial court showed clearly that S.P.K. had held himself out and acted as the A.Q.K.'s father for almost six years after the child's birth.

The case of *V.E.* is instructive in this regard. In that case, nine days after the child's (M.E.) birth, the mother filed a support action against W.M. *V.E.*, 54 A.3d at 369. W.M. filed preliminary objections, alleging that his own father, W.M., Sr., was M.E.'s biological father. *Id.* W.M. also alleged that the mother had accepted W.M., Sr., as M.E.'s father; W.M., Sr., had signed M.E.'s birth certificate as M.E.'s father; and W.M., Sr., had held M.E. out as his own and supported the child. *Id.* The trial court held that paternity by estoppel was not applicable, did not conduct a hearing, and ordered genetic testing. *Id.*

On appeal, this Court held that the trial court had properly disposed of the estoppel issue. *Id.* This Court reasoned that M.E. was only nine days old when the support complaint was filed, and only four months old when the trial court entered its order. *Id.* at 370. Therefore, insufficient time had elapsed for the court to deter-

---

**5.** The trial court's rulings were as follows: (1) When the guardian *ad litem* questioned R.K.J. as to whether she has provided a stable loving home for A.Q.K. and met his emotional needs, the trial court asked the guardian *ad litem* to "move on" because R.K.J.'s custody of A.Q.K. was not in question. N.T., 12/13/12, at 50.(2) When S.P.K.'s counsel questioned Hughes as to whether, when making a determination of a child's best interests, it was necessary to know all of the medical information available about the child, the guardian *ad litem* objected, on the basis that this action involves child support, not child custody. *Id.,* at 122. The trial court sustained the objection on the basis that such information was not relevant "from a support standpoint." *Id.,* at 123.(3) During cross-examination of R.K.J., counsel for S.P.K. asked whether "Mr. Krum has any prior medical or mental health history[.]" *Id.,* at 45. The attorney representing the Title IV–D interests of the Commonwealth objected, and the court asked whether the question was relevant. *Id.* Counsel for S.P.K. replied that it "is the best interest of the child ... to know his background in case he would have some [medical] problem...." *Id.,* at 45–46. The trial court sustained the objection to this question. *Id.,* at 46.(4) The trial court precluded S.P.K.'s counsel from asking R.K.J. about whether she has had boyfriends since S.P.K. *Id.,* at 42–43. The trial court precluded this evidence on the basis that it was irrelevant. *Id.,* at 43.(5) The trial court sustained an objection by the guardian *ad litem* to S.P.K.'s counsel's question to R.K.J. concerning whether R.K.J. had "any other friends" whom she had told or discussed the fact that S.P.K. is not A.Q.K.'s father. *See id.,* at 29–31. The trial court sustained the objection on the basis of relevance.

mine whether mother's prior conduct warranted application of the estoppel doctrine. *Id.* The Court further reasoned that "[t]he focus of the doctrine of paternity by estoppel is the father-child relationship and whether the relationship has been reinforced through either the mother or the 'father.'" *Id.* at 371. The Court concluded that "there has been an insufficient amount of time for any bonding to have occurred" between either of the prospective fathers and M.E. *Id.*

In the present case, unlike *V.E.*, S.P.K. held himself out as A.Q.K.'s father, and supported A.Q.K. for nearly six years. Thus, sufficient time has elapsed for the trial court to have applied the paternity by estoppel doctrine. In light of the above, we conclude that the trial court did not err or abuse its discretion in sustaining objections to the cited testimony.

S.P.K. next contends that the trial court erred in denying his Motions for genetic testing and to join A.Q.K.'s biological father as a party, and in attempting to determine A.Q.K.'s best interests without knowing the true biological father and by including him in the proceedings. S.P.K. contends that there is no intact family to protect in this case, and S.P.K. has had no contact with A.Q.K. for "several" years. Brief for Appellant at 21–22. S.P.K. cites the following statement by the Court in *K.E.M.* as support for his argument: "All things being equal in this regard, we conclude that the responsibility for fatherhood should lie with the biological father." *Id.* at 23 (quoting *K.E.M.*, 38 A.3d at 810).

In discussing whether the doctrine of paternity by estoppel continues to be valid, the Court in *K.E.M.* reasoned as follows:

Finally, in the wide range of instances with which our common pleas courts are presented, we realize that there will be children of broken marriages who may never enjoy the supportive relationship with either "psychological" or biological

fathers. All things being equal in this regard, we conclude that the responsibility for fatherhood should lie with the biological father.... [FN]

---

[FN] While our decision here reflects increased flexibility in the application of the paternity by estoppel doctrine, we note that courts have been most firm in sustaining prior adjudications (or formal acknowledgments) of paternity based on the need for continuity, financial support, and potential psychological security arising out of an established parent-child relationship. [citation omitted].

*K.E.M.*, 38 A.3d at 810 (some footnotes omitted). The context of the above quote shows that it applies to children of "broken marriages," who have never enjoyed a relationship with either a "psychological" or a "biological" father. In such a case, "[a]ll things being equal in this regard," the court should assign responsibility to the biological father. *See id.*

In the present case, all things are not equal between S.P.K. and the alleged biological father, whom S.P.K. seeks to join. Here, the biological father has had no relationship with A.Q.K. and has never met him. On the other hand, S.P.K. has held himself out as A.Q.K.'s father, lived with and interacted with A.Q.K. for nearly six years, told A.Q.K. that he was A.Q.K.'s father, and supported A.Q.K. financially. Thus, although S.P.K. denies his role as A.Q.K.'s father, the record shows that S.P.K. in fact functioned as such from A.Q.K.'s birth and for nearly six years thereafter. Under these circumstances, we conclude that the trial court did not err in applying the doctrine of paternity by estoppel and denying S.P.K.'s Motions for genetic testing and for joinder.

Order affirmed.

LAZARUS, J., concurs in the result.