J-S22030-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| C.A.R. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| R.E.M., III | |
| Appellant | No. 1976 WDA 2014 |

Appeal from the Order October 28, 2014
In the Court of Common Pleas of Blair County
Domestic Relations at No(s): DR 769-2013

BEFORE:  PANELLA, J., LAZARUS, J., and STRASSBURGER, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED JUNE 05, 2015**

R.E.M., III ("Father") appeals from the order of the Court of Common Pleas of Blair County denying his petition for DNA testing and rescission of an acknowledgement of paternity.  After our review, we agree with the trial court's conclusion that Father did not prove fraud by clear and convincing evidence so as to preclude the application of the doctrine of paternity by estoppel and rescind the acknowledgment of paternity.  We therefore affirm the trial court's order.

The parties were never married, but lived together from June 2009 until December 2013.  During that time, C.A.R. ("Mother") became pregnant and the child, R.E.M., was born in June 2010.  The parties gave R.E.M.

_____

[*] Retired Senior Judge assigned to the Superior Court.

Father's surname, and Father testified that he signed an acknowledgement of paternity[1] and believed he was R.E.M.'s Father.

The parties separated in December 2013. At that time, R.E.M. was two and one-half years old. Mother filed a complaint for child support on December 30, 2013. The county domestic relations office requested DNA testing. Mother refused. Father filed a Petition for Blood Test/Rescission of Acknowledgment of Paternity. The court held a hearing on October 2, 2014.

At the hearing, the parties' testimony differed as to the DNA testing. Mother testified that in order to get paternal grandmother "off their back," the parties agreed to use the DNA samples from a family friend and his biological daughter, thereby ensuring the test would demonstrate a positive match between parent and child. N.T. Hearing, 10/2/14, at 19. Mother stated that Father "agreed to get a DNA test done with different DNA . . . because he wanted to be her father either way and his mother did not approve." *Id.* Mother explained that she and Father obtained DNA samples from a male friend and his daughter, and mailed the samples for testing. Mother also testified that Father's mother "got the DNA of [R.E.M.] and [Father] and sent it in. I never saw the results and I found out about it about a year later." *Id*. at 20. She continued,

> [Father] said---well, at first he told me that there was a
> rumor that [his mother] did it and he denied the fact that

_____

[1] *See* 23 Pa.C.S.A. § 5103.

it was happening and then he told me that it was, in fact, done and he didn't want to see the results but his mother said it was negative.

***Id.*** at 20-21.

Father testified that after R.E.M.'s birth, his mother asked for a DNA test and "it came out 99.9 percent positive." ***Id.*** at 5. He stated that he obtained his DNA from inside his cheek with a Q-tip, Mother obtained the child's DNA through the same method, and that these Q-tips were placed in a plastic zip lock baggie. He stated it was his understanding that Mother sent the swabs to the laboratory. ***Id.*** at 9-11. Father stated at the hearing, "I recently found out that the DNA was fake DNA; they were not mine or [R.E.M.'s]." ***Id.*** He also acknowledged that he never personally saw the test results. ***Id.*** at 9, 12.

Mother acknowledged that it is possible Father is not the biological father; she stated that when she found out she was pregnant, she "told him that there was a chance that he could be the father and shortly after we got together he told me that he wanted to be the father either way." ***Id.*** at 23. She stated that Father continued to assume and perform parental duties for a year after the parties separated. Mother stated Father saw R.E.M. every week and would keep her one night during the week. ***Id.*** at 22. Mother also testified that she had told Father many times he could walk away if he wanted, and that she requested he do so at a time when R.E.M. would be too young to remember; she stated that [R.E.M.], who was 2½ at the time of the hearing, remembers him and "asks for him." ***Id.*** at 27.

Father acknowledged that "in the beginning" he had some suspicion he might not be the father. *Id.* at 30. He testified that "then we had that DNA test done and I went off of that and that kind of eased it until I later on found out that the test had been frauded [sic]." *Id.* Father also admitted he did not seek DNA testing until after Mother filed her complaint for child support. *Id*. at 33. Father testified that he continued to exercise his partial custody rights, but he stated he did so only for six months after the parties separated. *Id.* at 8. He stated he saw R.E.M. every weekend and she would stay overnight. *Id.*

Maternal grandmother also testified. She stated that while the parties cohabitated, they lived with her in her house and during that time, it was no secret that Mother was in a relationship with another man. She also testified that she was present when Mother and Father were discussing sending the DNA from a family friend and his biological daughter because paternal grandmother was not happy with the relationship. *Id.* at 35-36.

Following the hearing, the trial court denied Father's petition. The court issued an opinion containing twenty-one (21) findings of fact. See Trial Court Opinion, 10/28/14. Father appealed. The court ordered Father to file a Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P.

1925(b). The trial court filed its Rule 1925(a) opinion on December 23, 2014. Father raises the following issues for our review:[2]

1. Whether the trial court abused its discretion in deciding that the defendant below and challenger of paternity in the support action had failed to prove by clear and convincing evidence fraud in the acknowledgement of paternity for purposes of 23 Pa.C.S. § 5103(g)(2) and the trial court's findings were unsupported?

2. Whether the trial court abused its discretion in deciding that paternity by estoppel applied to the challenge of paternity in the support action inasmuch as the requisite fraud had been proved and no sufficient basis for paternity by estoppel had been established in the proceedings before the trial court.

Appellant's Brief, at 4.

For ease of discussion, we address Father's second issue first. Father argues the court erred in applying the doctrine of paternity by estoppel because he had proven the requisite fraud.

Our standard of review in paternity cases is an abuse of discretion. *See D.M. v. V.B.*, 87 A.3d 323 (Pa. Super. 2014); *see also Doran v. Doran*, 820 A.2d 1279, 1282 (Pa. Super. 2003) (applying this standard of review to case involving question of paternity).

> An abuse of discretion exists if the trial court has overridden or misapplied the law, or if there is insufficient evidence to sustain the order. Moreover, resolution of factual issues is for the trial court, and a reviewing court will not disturb the trial court's findings if they are supported by competent evidence. It is not enough [for reversal] that we, if sitting as a trial court, may have made a different finding.

---

[2] Mother has not filed an appellate brief.

***D.M.***, 820 A.2d at 1284 (citations omitted). "The finder of fact is entitled to weigh the evidence presented and assess its credibility." ***Smith v. Smith***, 904 A.2d 15, 20 (Pa. Super. 2006). In so doing, the finder of fact "is free to believe all, part, or none of the evidence and [we as an appellate court] will not disturb the credibility determinations of the court below." ***Id***. (citation omitted).

In ***K.E.M. v. P.C.S.***, 38 A.3d 798 (Pa. 2012), our Supreme Court granted allowance of appeal to consider the application of the doctrine of paternity by estoppel and, more broadly, "its continuing application as a common law principle." ***Id***. at 803. There, Mother filed a support action against P.C.S. seeking support of her child who was born during her marriage to H.M.M. ("Husband"). Following genetic testing, Husband was excluded as the biological father, but he remained in the marriage and held himself out to the general public as the child's father for the first four years of the child's life. Although K.E.M. and Husband separated, as of the time of the hearing neither had filed for divorce. K.E.M. had made P.C.S. aware of the fact that he might be the biological father of the child. P.C.S. refused genetic testing, but he acknowledged the child as his son. The child referred to both Husband and P.C.S. as "Daddy."

In response to K.E.M.'s support action, P.C.S. relied on the presumption of paternity. ***See Brinkley v. King***, 701 A.2d 176, 180 (Pa. 1997) (policy underlying presumption of paternity is preservation of marriages; presumption only applies in cases where that policy would be

advanced by application, otherwise, it does not apply). As K.E.M.'s marriage to Husband was no longer intact, the Court determined the presumption was not applicable and confined its review to the question of paternity by estoppel. Quoting an opinion authored by the late Honorable William F. Cercone, the Court agreed that

> [a]bsent any overriding equities in favor of the putative father, such as fraud, the law cannot permit a party to renounce even an assumed duty of parentage when by doing so, the innocent child would be victimized. Relying upon the representation of the parental relationship, a child naturally and normally extends his love and affection to the putative parent. The representation of parentage inevitably obscures the identity and whereabouts of the natural father, so that the child will be denied the love, affection and support of the natural father. As time wears on, the fiction of parentage reduces the likelihood that the child will ever have the opportunity of knowing or receiving the love of his natural father. While the law cannot prohibit the putative father from informing the child of their true relationship, it can prohibit him from employing the sanctions of the law to avoid the obligations which their assumed relationship would otherwise impose. . . . The operative language of this passage centers on the best interests of the child[.]

*K.E.M.*, 38 A.3d at 807-08, quoting *Commonwealth ex rel. Gonzalez v. Andreas*, 369 A.2d 416, 419 (Pa. Super. 1976). The Court emphasized that the best interests of the child "remains the proper, overarching litmus, at least in the wider range of cases." *K.E.M.*, 38 A.3d at 808, quoting *Gonzalez*, *supra*.

The Court determined that the record in *K.E.M.* was not developed with respect to the best interests of the child and the child's relationship with Husband. Stating that it had "no sense for the harm that would befall [the

child] if [Husband's] parental status were to be disestablished, either fully or, as some intermediate court decisions are now suggesting is permissible, partially (i.e., for purposes of support)," *id*. at 809, the Court remanded the case to the trial court. The Court further stated, "[W]hereas the common pleas court suggested that the present record is extensive, in fact, it is very sparse in terms of [the child's] best interests." *Id*. The Court concluded, "[i]n summary, paternity by estoppel continues to pertain in Pennsylvania, but it will apply only where it can be shown, on a developed record, that it is in the best interests of the involved child." *Id*. at 810.

Here, the trial court applied the doctrine of paternity by estoppel, *see K.J. v. S.P.K.*, 77 A.3d 33, 38 (Pa. Super. 2013), and concluded that Father did not establish fraud by clear and convincing evidence. *See* 23 Pa.C.S.A. § 5103(g)(2). The court made factual findings, supported in the record, and reasoned that, had Father seriously questioned his paternity, he would have insisted on seeing the written DNA test results. The court found it "incredulous" that Father did not. We agree. Simply put, the court found Father's testimony not credible. *See Smith*, *supra*. The record is replete with testimony that supports the court's finding that Father was aware of the possibility he was not R.E.M.'s biological father from the outset, that he signed an acknowledgement of paternity, and that despite his questioning of his paternity, he took no positive steps to assure himself of the facts. Instead, he chose to remain a father to R.E.M., even after the parties ended their relationship. The record supports the court's finding that Father failed

to establish fraud by clear and convincing evidence. Absent fraud, Father "regardless of his true biological status, will not be permitted to deny parentage[.] . . . [T]he doctrine of estoppel in paternity actions is aimed at achieving fairness as between the parents by holding them, *both* mother and father, to their prior conduct regarding the paternity of the child." *Brinkley v. King*, 701 A.2d 176, 180 n. 5 (Pa. 1997), quoting *Freedman v. McCandless*, 654 A.2d 529, 532–33 (Pa. 1995)(emphasis in original). *See R.K.J. v. S.P.K.*, 77 A.3d 33 (Pa. Super. 2013) (evidence supported application of doctrine of paternity by estoppel, for purposes of child support, such that purported father could not be permitted to deny parentage; unlike child's biological father, who had no relationship with child and had never met him, purported father for child support purposes had held himself out as child's father, lived with and interacted with child for nearly six years, told child he was child's father, and supported child financially); *see also Hamilton v. Hamilton*, 795 A.2d 403 (Pa. Super. 2002) (where father signs acknowledgement of paternity and holds himself out as father, but then attempts to deny paternity when support is sought, doctrine of paternity by estoppel applies to preclude father from denying paternity); *cf. Gebler v. Gatti*, 895 A.2d 1 (Pa. Super. 2006) (paternity by estoppel doctrine did not apply where putative father's behavior as responsible father for 18 months was caused by mother's concealment of the truth).

Further, the record is clear that it is in R.E.M.'s best interests to apply the doctrine of paternity by estoppel here. Unlike in **K.E.M.**, there is no other father figure in the picture; Father is the only father R.E.M. has known for four years. She remembers him and asks for him. Regardless of whether Father chooses to remain a part of R.E.M.'s life, his prior conduct imposes a financial responsibility. **R.K.J.**, **supra**.

With respect to rescission of the acknowledgement of paternity on grounds of fraud, 23 Pa.C.S.A. § 5103(g)(2)[3], we note that Father did not

_____

[3] Section 5103(g) provides:

(g) Rescission.—

(1) Notwithstanding any other provision of law, a signed, voluntary, witnessed acknowledgment of paternity subject to 18 Pa.C.S. § 4904 shall be considered a legal finding of paternity, subject to the right of any signatory to rescind the acknowledgment within the earlier of the following:

    (i) sixty days; or

    (ii) the date of an administrative or judicial proceeding relating to the child, including, but not limited to , a domestic relations section conference or a proceeding to establish a support order in which the signatory is a party.

(2) *After the expiration of the 60 days, an acknowledgment of paternity may be challenged in court only on the basis of fraud, duress or material mistake of fact, which must be established by the challenger through clear and convincing evidence.* An order for support shall not be suspended during the period of challenge except for good cause shown.

23 Pa.C.S.A. § 5103(g)(1),(2) (emphasis added).

present this issue in his Rule 1925(b) Statement. That claim, therefore, is waived. *See* Pa.R.A.P. 1925(b). Nonetheless, the statute provides that rescission may only be challenged on the basis of fraud, duress or material mistake of fact, which must be established by clear and convincing evidence, 23 Pa.C.S.A. § 5103(g)(2), and we have determined that Father did not prove fraud by clear and convincing evidence.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/5/2015