J-A30038-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| A.S.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| E.M.S. | |
| Appellee | No. 1151 MDA 2016 |

Appeal from the Order Entered June 10, 2016
In the Court of Common Pleas of York County
Criminal Division at No(s): 2016-FC-366-23

BEFORE:  BOWES, J., OLSON, J., AND STABILE, J.

CONCURRING MEMORANDUM BY BOWES, J.:  **FILED FEBRUARY 24, 2017**

I concur with the learned majority's disposition and join in the well-reasoned statement of rationale relating to Father's inability to rescind his acknowledgment of paternity of his now-nine-year-old son, B.P.M., pursuant to 23 Pa.C.S. § 5103, and the trial court's rejection of Father's motions for additional testimony.[1]  I write separately to highlight what I perceive as a

---

[1] As it relates to Father's claim that he is entitled to a paternity test pursuant to a support order entered in 2010, I add two observations.  First, Father misstates the nature of the operative order.  Contrary to Father's characterization, the order does not direct Mother to submit B.P.M. to genetic testing.  In reality, the 2010 support order memorialized Mother's assent to private testing at that time provided that Father paid for it.  Father neglected to schedule genetic testing for the ensuing six years.  Stated plainly, as no order exists directing Mother to comply with genetic testing, the trial court did not err in denying Father's petition to enforce it.  Second,
*(Footnote Continued Next Page)*

conspicuous omission in the review of Father's request: the child's best interest.

Instead of a mechanical application of § 5103(g)(2)[2] to determine whether Father had been deluded by fraud, duress, or mistake of fact in executing the written acknowledgment, I favor an approach that requires trial courts to incorporate the best interest of the child in determining whether a non-birth father may rescind his acknowledgement of paternity. My position is founded on the recognition that the rescission of an acknowledgment of paternity pursuant to § 5103(g)(2) and the decision concerning whether to apply paternity by estoppel share attributes, which our High Court found in *K.E.M. v. P.C.S.*, 38 A.3d 798 (Pa. 2012), implicated the best interest of the child as the predominate consideration.

_(Footnote Continued)_ _____

this issue is a red herring. The certified record includes the results of a private genetic test performed during 2015 that confirms the 99.99% probability that an individual identified as R.S., is the birth Father. Thus, Father's paternity is conclusively disestablished, at least genetically, and a second paternity test would be superfluous. A more convincing argument, which Father declined to assert, would have addressed the effect of the conclusive genetic evidence on Father's previously executed acknowledgment of paternity absent fraud, duress, or mistake of fact.

[2] In pertinent part, § 5103(b)(2) provides, "After the expiration of the 60 days, an acknowledgment of paternity may be challenged in court only on the basis of fraud, duress or material mistake of fact, which must be established by the challenger through clear and convincing evidence."

Section 5103 is the natural extension of our legislature's codification in § 5102(b)(2) of the common law doctrine of paternity by estoppel,[3] the principle that, in the absence of a marriage, a male who has held himself out as the child's father is estopped from challenging paternity regardless of biology. *See Kohler v. Bleem*, 654 A.2d 569, 574 n.7 (Pa.Super. 1995) ("The General Assembly has codified the principles of paternity by estoppel in cases involving children born out of wedlock. *See* 23 Pa.C.S.A. § 5102(b)(2)"). The interrelationship between a § 5103(g)(2) rescission and the common law doctrine is best illustrated by the fact that the two principles require identical considerations in determining the effect of fraud in the formation of the parental relationship. For example, just as proof of fraud will defeat the application of paternity by estoppel, the same facts would provide a basis to rescind an acknowledgment of paternity pursuant to § 5103. *Compare R.W.E. v. A.B.K.*, 961 A.2d 161 (Pa.Super. 2008) (applying five-prong approach to determine fraud in the context of rescinding acknowledgment of paternity under § 5103(g) and *Doran v.*

_____

[3] The relevant portion of § 5102 provides that the paternity of children born out of wedlock may be determined by the father's actions when, "during the lifetime of the child, the father openly holds out the child to be his and receives the child into his home, or openly holds out the child to be his and provides support for the child which shall be determined by clear and convincing evidence."

23 Pa.C.S. § 5102(b)(2).

- 3 -

*Doran*, 820 A.2d 1279, 1283-84 (Pa.Super. 2003) (outlining identical "test for fraud" to determine whether to apply paternity by estoppel).

In **K.E.M.**, **supra** at 803, our Supreme Court examined a paternity dispute in the context of child support and confronted "the application of the doctrine of paternity by estoppel . . . [and] its continuing application as a common law principle."  The High Court first noted the doctrine's role in Pennsylvania jurisprudence and approvingly recited this Court's prior observation in **Commonwealth ex rel. Gonzalez v. Andreas**, 369 A.2d 416, 419 (Pa. Super 1976):

> Absent any overriding equities in favor of the putative father, such as fraud, the law cannot permit a party to renounce even an assumed duty of parentage when by doing so, the innocent child would be victimized. Relying upon the representation of the parental relationship, a child naturally and normally extends his love and affection to the putative parent. The representation of parentage inevitably obscures the identity and whereabouts of the natural father, so that the child will be denied the love, affection and support of the natural father. As time wears on, the fiction of parentage reduces the likelihood that the child will ever have  the opportunity of knowing or receiving the love of his natural father. While the law cannot prohibit the putative father from informing the child of their true relationship, it can prohibit him from employing the sanctions of the law to avoid the obligations which their assumed relationship would otherwise impose.

*Id*. at 807–08.  The High Court interpreted the foregoing discussion as emphasizing the best interest of the child, which it proclaimed to be the paramount consideration in applying the doctrine.  The Court stated, "The operative language of this passage centers on the best interests of the child,

and we are of the firm belief—in terms of common law decision making—that this remains the proper, overarching litmus, at least in the wider range of cases." *Id*. at 808.

Hence, in *K.E.M.*, our Supreme Court determined that the doctrine of paternity by estoppel would only be applied in situations where maintaining the fiction of the father-child relationship was in the child's best interests based upon a developed record. Specifically, the High Court stated, "paternity by estoppel continues to pertain in Pennsylvania, but it will apply only where it can be shown, on a developed record, that it is in the best interest of the involved child." *Id*. at 810. Significantly, as it relates to the facts in the case at bar, the Supreme Court reasoned in *K.E.M. supra*, that since the putative father was not deluded into believing that he was the birth-father, "the strongest case for 'overriding equities' [,such as fraud,] is not present[.]" *Id* at 808 n.7. Nevertheless, it determined, "even in such circumstances, there are arguments to be made that the best interests of a child should remain the predominate consideration[.]" *Id*.[4]

---

[4] I recognize that the *K.E.M.* Court was hesitant to extend its reasoning to cases, such as the case at bar, where a parent has executed a formal acknowledgement of paternity. *See K.E.M.,supra* at 810 n.12, ("While our decision here reflects increased flexibility in the application of the paternity by estoppel doctrine, we note that courts have been most firm in sustaining prior adjudications (or formal acknowledgments) of paternity based on the need for continuity, financial support, and potential psychological security arising out of an established parent-child relationship."). However, I believe
*(Footnote Continued Next Page)*

This Court applied **K.E.M.** in ensuing cases with varied results. In **V.E. v. W.M.**, 54 A.3d 368 (Pa.Super. 2012), we held that the doctrine did not apply in a child support case where there was no relationship between a putative father and a four-month-old child born out of wedlock. The doctrine was asserted as a defense to a complaint in child support. The defendant denied paternity and averred that the putative father, who signed the birth certificate, was the biological father. We affirmed the trial court's finding that the doctrine was inapplicable even though the putative father had acknowledged the infant as his own during the brief four-month period. We explained, "Where there is no relationship, application of the doctrine is irrelevant to the child's best interests. Absent a relationship, what becomes relevant is who will be financially responsible for the child." **Id**. at 371. Rather than require the trial court to apply the doctrine mechanically under those facts, we upheld the court's determination that genetic testing was the most efficient method to determine paternity, and therefore financial responsibility.

Later, in **R.K.J. v. S.P.K.**, 77 A.3d 33 (Pa.Super. 2013), another child support case involving a § 5103(g) rescission as well as paternity by

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯

that the psychological and economic best-interest considerations that we fashioned in **R.K.J. v. S.P.K.**, 77 A.3d 33 (Pa.Super. 2013), which I discuss _infra_, alleviate the noted concerns regarding continuity, financial support, and psychological security.

estoppel, this Court distinguished the facts underlying that case from the facts of *V.E.* on the basis that, unlike *V.E.*, sufficient time passed in that case for the father-child relationship to blossom. *Id*. at 42. In order to determine whether application of the common law doctrine was in the child's best interest, we fashioned five psychological and economic considerations. Those factors, which we gleaned from *K.E.M.*, *supra* were: (1) a party cannot renounce an assumed duty of parentage when the innocent child would be victimized; (2) the law can prohibit a putative father from employing sanctions of the law to avoid the obligations that his assumed relationship with the child would impose; (3) the closeness of the child's relationship to the putative father; (4) the harm that would befall the child if the putative father's parental status were to be disestablished; and (5) the need for continuity, financial support, and potential psychological security arising out of an established parent-child relationship. *Id*. at 38.

Applying these factors, the *R.K.J.* Court affirmed the trial court's determination that the evidence supported application of the doctrine of paternity by estoppel to bar the putative father from disestablishing paternity. We reasoned, *inter alia*, that 1) the putative father executed the acknowledgment of paternity knowing he was not the birthfather; 2) while the biological father had never interacted with the child, the purported father, whom the child calls "dad" lived with the child for several years, and bonded with him for approximately six years. We noted approvingly, "the

evidence before the trial court addressed the factors set forth in *K.E.M.* as relevant to the child's best interests [and] the trial court did not apply the doctrine of paternity by estoppel by rote, but considered the individual circumstances of this case, as required by *K.E.M.*" *Id*. at 40.

Relating the foregoing principles from *K.E.M.*, *supra*, *V.E.*, *supra*, and *R.K.J.*, *supra* to the instant factual scenario for the purpose of demonstration, I do not believe that the proposed best-interest considerations would have influenced the trial court's determination regarding Father's attempts to rescind his acknowledgment of paternity pursuant to § 5103(g). I observe that Father testified that he had no relationship with B.P.M. and highlighted that genetic testing confirmed that R.S. was the child's biological father. Consistent with *V.E.*, *supra*, both of these factors militate in favor of finding that the results of the 2015 genetic test is the most direct method to determine financial responsibility for B.P.M.

Conversely, however, Mother testified that Father maintained a modicum of a relationship with B.P.M. between 2007 and 2012. More importantly, Appellant executed the acknowledgement of paternity despite his suspicions that he was not the birth father, and he continues to satisfy his child support obligations. While R.S. has been identified as the genetic parent, unlike Father, R.S. never made a financial commitment to the child and there is no evidence that the nine year old has established contact with R.S. nor that a relationship is likely to spring from the scientific confirmation

of paternity. Hence, this case is more complex than the mechanical assessment of financial responsibility that we addressed in **V.E.**, **supra**. In addition to the financial aspects of the decision, the current facts reveal the child's need for continuity and the psychological security arising out of the cessation of a weak, but established, parent-child relationship. Thus, I do not believe that the proposed application of the child's best-interest would have affected the trial court's decision to reject Father's request to rescind his acknowledgement of paternity.

In sum, I believe that the General Assembly should revisit the binding legal fiction created by § 5103 in light of the advancements in genetic testing and our contemporary perspective of family and fashion an approach for rescinding the acknowledgment of paternity that requires trial courts to consider the child's best interests in the same manner that our High Court demands that trial courts address the issue when determining whether to apply the doctrine of paternity by estoppel.